Joseph L. Micciche and Louise E. Micciche v. Commissioner.
Micciche v. Commissioner
Docket No. 2914-64.
United States Tax Court
T.C. Memo 1966-138; 1966 Tax Ct. Memo LEXIS 144; 25 T.C.M. (CCH) 710; T.C.M. (RIA) 66138; June 21, 1966
*144 1. Respondent's determination of petitioners' taxable income by the increase in net worth and nondeductible expenditures method approved, with certain adjustments. 2. Respondent failed to prove fraud by the clear and convincing evidence required. Additions to tax for fraud disapproved. 3. Assessment and collection of deficiency in tax for 1959 not barred by statute of limitations. Six-year period for assessment provided in section 6501(e)(1), I.R.C. 1954, applicable. Gene W. Reardon and Julie M. Reardon, 2150 First National Bank Bldg., Denver, Colo., for the petitioners. Arthur B. Bleecher, for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined a deficiency in the income tax of Joseph L. Micciche for the year 1959 in the amount of $2,300.39 and an addition to tax under section 6653(b), I.R.C. 1954, [1] in the amount of $1,150.20; and also determined deficiencies in the income tax of Joseph L. and Louise E. Micciche for the years 1960 and 1961 in the amounts of $2,034.70 and $3,701.74, respectively, and additions to tax for those years under section 6653(b), in the amounts of $1,017.35 and $1,850.87, respectively. By amendment to his answer respondent claims increased deficiencies and additions to tax for each of the years involved. *146 The issues for decision are (1) whether respondent erred in his determination of petitioners' taxable income for each of the years involved under the net worth and nondeductible expenditures method, (2) whether any part of any underpayment of tax by petitioners was due to fraud, and (3) whether assessment of a deficiency in tax for the year 1959 is barred by the statute of limitations. Findings of Fact The stipulated facts are so found. Petitioners were husband and wife residing in Denver, Colo., during the years 1959, 1960, and 1961. Joseph L. Micciche (hereinafter referred to as petitioner) timely filed an individual income tax return for the calendar year 1959 and Joseph L. and Louise E. Micciche timely filed joint income tax returns for the calendar years 1960 and 1961, with the district director of internal revenue, Denver, Colo.
Petitioner was born in 1930. During the years 1956 through 1958 petitioner was employed as a butcher or meat cutter and reported adjusted gross and taxable income (including about $800 in wages earned by Louise in 1956 and some rental income) on his tax returns, as follows: 1956
1957
1958
Adjusted gross in-
come
$7,702.08
$6,369.03
$7,459.95
Taxable income
4,648.39
3,174.61
During the years 1956-58 petitioner borrowed money from several banks and lending institutions from time to time. Petitioner received wages from John Sullard and Lloyd Van Skiver and from Safeway Stores, Inc., in the total amount of $693.03 in 1959 which he reported on his income tax return, and they withheld tax on his wages in the amount of $85.90. Early in 1959 petitioner gave up his employment as butcher or meat cutter and began working as a bartender for Frank Mortellaro, who conducted his unincorporated tavern and restaurant business in Denver under the name of Golden Buffet. This employment continued until early December 1960, shortly after the death of Mortellaro. Petitioner reported wages received from Mortellaro in the amount of $2,420, and tax withheld in the amount of $109.20, on his 1959 return, and reported wages received from the Golden Buffet in the amount of $2,500, and tax withheld in the amount of $110, on his 1960 return. The only other income reported by petitioners on their 1960 return was a small amount of rental income. The returns filed for the years here involved did not reflect any separate income received by Louise. During part of 1959 petitioner was a partner of Charles E. Forrest in the sale of used automobiles under the name of North Federal Auto Sales. No partnership return was filed and petitioner reported no income or loss from the partnership on his 1959 return. Petitioner kept a record of the automobiles bought and sold and the cost and sales prices thereof. This record indicates that between June and November, 1959, 16 automobiles were purchased for a total of $5,677.50 and were sold for a total of $6,085, for a total net profit of $407.50. The record reflects the purchase of a 1957 Chevrolet for $1,950 and the sale of that vehicle to George D. Newell for $1,695, for a loss of $255. An installment sale contract for this car signed by Newell indicates a cash sale delivered price of $2,000, sales tax of $60, a cash downpayment of $760, insurance and financing charges totaling $656.90, and a time balance due of $1,956.90. This was the last automobile sold by the partnership and it was sold by petitioner. The partnership discontinued business in late 1959 because the profits realized did not justify the time required of Forrest to operate the business. Forrest borrowed $300 from the business when it was dissolved and has never paid it back. Mortellaro was a close friend of petitioners' family and was found of petitioner. Mortellaro was unmarried during this period and had no children of his own. During the period petitioner worked at the Golden Buffet Mortellaro went to Europe for a period of 2 or 3 months, probably in 1959, and was hospitalized twice, the first time from October 21, 1960, to November 3, 1960, and the second time from November 12, 1960, until his death on November 29, 1960. During Mortellaro's absence from the business petitioner was in charge of the day-to-day operations of the business. Petitioner was authorized to sign checks on the Golden Buffet bank account, and did so. During the latter part of 1959 petitioner made rather frequent deposits of currency in his checking account at the First State Bank of Westminster (now First National Bank), Westminster, Colo., and on December 14, 1959, deposited in this account two checks totaling $3,300. Petitioner continued to make frequent deposits to this account during 1960; on both August 3 and August 18, 1960, he deposited $1,000; on December 19 he deposited $1,490 in currency and $1,008.89 in checks; and on December 27, 1960, he deposited $700 in currency and $1,631.48 in checks to this account. During this same period petitioner had a savings account at the First State Bank of Westminster, Westminster, Colo., into which he deposited $1,800 in October 1959, $1,435 in December 1959, and $2,696 in June 1960. He apparently transferred $1,300 on December 14, 1959, and $1,000 on both August 3 and August 18, 1960, from this savings account to his checking account above mentioned. Petitioner also opened a savings account at the First National Bank of Denver on October 14, 1959, with a deposit of $500. He made seven additional deposits in this account, ranging from $300 to $850 during 1960, until the entire balance of $4,269.77 was withdrawn on December 8, 1960. On December 8, 1960, petitioner opened a savings account in his name at the Bank of Denver and deposited therein a cashier's check payable to the order of "Joe Micciche" in the amount of $4,269.77 drawn on the First National Bank of Denver, and a cashier's check in the amount of $475.68 drawn on the American National Bank. $2,000 was withdrawn from this account on December 16, 1960, and $2,700 was withdrawn on January 16, 1961. This account was closed on October 31, 1961. By contract dated November 28, 1960, petitioner purchased from John M. Prande and Fred E. Kentz the Log Cabin Inn, a tavern and bar located at 3109 Federal Boulevard, Denver, Colo., together with most of the furniture and fixtures therein. The closing date was stated in the contract to be December 31, 1960. The purchase price was stated to be $21,500, plus inventory at cost, payable $500 down, $7,000 in cash at time of closing, and $14,000 evidenced by a promissory note from petitioner to Kentz, payable in monthly installments of $300 or more, including interest at 9 percent, secured by a chattel mortgage on the furniture and fixtures. The chattel mortgage was signed and acknowledged by petitioner on December 31, 1960. The inventory was priced at $1,000, making a total purchase price of $22,500. On December 21, 1960, petitioner opened a checking account in the name of Log Cabin Inn at the Bank of Denver with a deposit of $5,000, which appears to have been borrowed from that bank. Only three small checks were drawn on this account during December 1960, in addition to one check in the amount of $2,500 dated December 29, 1960, and made payable to Prande. Thereafter this account was rather active with both deposits and withdrawals, but with a diminishing balance, until it was closed out on April 7, 1961. On February 21, 1961, petitioner opened a checking account in the name of Log Cabin Inn at the Central Bank & Trust Co., Denver, with a deposit of $5,000. This account was quite active with both deposits and withdrawals throughout the year 1961 and at least until January 15, 1962, at which time it contained a balance of $1,580.78. Petitioner operated the Log Cabin Inn for Prande during the latter part of December 1960, and continued to operate it in his own behalf starting January 1, 1961, and continuing throughout the period here involved. Petitioner applied to the City and County of Denver for a liquor license for use under the trade name Log Cabin Inn on December 7, 1960, to become effective on January 1, 1961. The application stated that the business was to be purchased as of January 1, 1961. On the application petitioner stated that he had previously been employed as bartender and manager of the Golden Buffet and the individual at the licensing department who interviewed petitioner noted on the back of the application that petitioner said the balance in his bank account at the First National Bank of Denver, in the amount of $4,269.77, was "his share of profits as Manager of Golden Buffet for his uncle Frank Mortalero." Petitioner paid for the Log Cabin Inn as follows: (1) $500 in cash was paid to Prande when the contract was signed; $2,500 was paid to Prande by check drawn on the Log Cabin Inn account at the Bank of Denver on December 29, 1960; and an additional $2,600 was paid to Prande with five checks between January and March 7, 1961. (2) By check dated January 5, 1961, petitioner paid $2,000 to Murray Bros. for the account of "Jack Prande." (3) By check dated January 9, 1961, petitioner paid $600 to John Downing-Service Loan Co. for the account of "Jack Prande." (4) Petitioner assumed a loan made by Fred Kentz to John Prande, the balance due on which was $14,000 at December 31, 1960, secured by a chattel mortgage to Kentz on the goodwill, furniture, and fixtures of the Log Cabin Inn executed by petitioner and dated December 31, 1960. [2] Petitioner made monthly payments of $300 on this note throughout the period here involved, starting with a payment of $300 on January 31 or February 1, 1961. *147 (5) The remaining $300 is not accounted for in the record but Prande testified that petitioner still owed him something on the purchase price. Petitioners did not keep adequate books and records of their income and expenditures so respondent reconstructed their adjusted gross income by the net worth and expenditures method, as follows: COMPARATIVE STATEMENTS OF NET WORTH
Joseph L. and Louise E.
Joseph L. Micciche
Micciche
1/1/59
12/31/59
12/31/60
12/31/61
ASSETS
Cash on hand
$ 4,000.00
$ 4,000.00
$ 4,000.00
$ 4,000.00
First National Bank, Westminster, check-
ing account
369.39
1,796.67
First National Bank, Westminster, check-
ing account outstanding checks
(17.91)
(2,063.68)
First National Bank, Westminster, savings
account
140.00
198.89
2.88
North Denver Bank, checking account
12.07
First National Bank, Denver, savings ac-
count
952.38
Bank of Denver, savings account
2,745.45
Bank of Denver, checking account Log
Cabin Inn
2,388.00
Bank of Denver, checking account Log
Cabin Inn outstanding checks
(742.15)
Central Bank & Trust Co. checking ac-
count Log Cabin Inn
2,670.88
Central Bank & Trust checking account
Log Cabin Inn outstanding checks
(755.55)
Central Bank & Trust Co. savings account
384.93
Safeway Employees Credit Union - share
account
25.70
Inventory Log Cabin Inn
1,000.00
650.00
Depreciable assets, Log Cabin Inn
6,281.96
11,045.71
Goodwill, Log Cabin Inn
13,155.05
17,755.05
Loan receivable - Fred Bergamo
400.00
Loan receivable - Chubby Ron
10.00
Loan receivable - James Brady
686.00
Prepaid rent and liquor license
944.50
Deferred interest and loan costs
1,141.75
120.09
Personal residence
18,046.00
18,046.00
20,161.13
20,899.95
Tax and insurance reserve personal resi-
dence
265.14
349.42
458.12
428.61
Furniture and fixtures - personal
694.12
2,132.21
2,698.21
2,920.88
Rental furniture, home apartment
860.00
860.00
860.00
860.00
Rental property - 6240 W. 44th Avenue -
land
879.40
Rental property - 6240 W. 44th Avenue -
house
5,227.56
Rental property - 6240 W. 44th Avenue -
furniture - one-half
154.25
Rental property - 6240 W. 44th Avenue -
furnace - one-half
282.50
Automobiles: Ford Thunderbird
$ 4,335.00
1950 Plymouth
$ 225.00
Auto trailer
50.00
50.00
$ 50.00
1961 Chevrolet Impala
2,743.03
$ 2,743.03
1940 Ford pickup
100.00
1955 Chevrolet pickup
581.02
Account receivable, Leo Micciche
501.90
Total assets
$24,178.03
$31,216.49
$58,912.93
$71,453.09
LIABILITIES
Home mortgage - General Investment Co.
(Johnson-Anderson Mortgage Co.)
$10,793.73
$10,503.00
$10,146.88
$ 9,880.84
Note payable - Englewood State Bank
156.16
Note payable - Liberty Loan Co.
135.00
Note payable - Central Bank & Trust Co.
No. 5-24587
62.79
Note payable - Central Bank & Trust Co.
No. 5-7991
103.04
Note payable - Central Bank & Trust Co.
1,615.23
Note payable - First Federal Savings &
Loan Assn.
2,731.34
1,700.00
700.00
Note payable - Bank of Denver
542.92
6,134.25
Note payable - North Denver Bank
605.03
Note payable - Continental Industrial Bank
202.00
Note payable - First National Bank West-
minster
207.50
Note payable - Fred Kentz
14,000.00
11,561.02
Note payable - Citizens Savings Bank
819.00
Note payable - Guaranty Bank & Trust
Co.
412.96
Note payable - Service Loan Co.
600.00
Note payable - Midland Savings & Loan
Assn.
4,175.35
Safeway Employees Credit Union
503.00
Reserve for depreciation, home rental unit
653.84
1,010.53
1,129.42
1,129.42
Reserve for depreciation, Log Cabin Inn
750.65
Reserve for depreciation, 6240 W. 44th
Avenue
100.48
Accrued taxes
498.52
Total liabilities
$15,681.82
$13,818.56
$34,352.01
$29,711.51
Net worth
8,496.21
17,397.93
24,560.92
41,741.58
Total liabilities and net worth
$24,178.03
$31,216.49
$58,912.93
$71,453.09
Net worth end of year
$17,397.93
$24,560.92
$41,741.58
Net worth beginning of year
8,496.21
17,397.93
24,560.92
Net worth increase
$ 8,901.72
$ 7,162.99
$17,180.66
Personal expenditures
3,802.07
5,220.28
3,087.47
Total
$12,703.79
$12,383.27
$20,268.13
Nontaxable income
220.60
178.06
118.06
Total
$20,150.07
Capital loss carryover
900.00
Adjusted gross income
$12,483.19
$12,205.21
$21,050.07
*148 Ultimate Findings Petitioners' correct adjusted gross income for the years 1959, 1960, and 1961 was as computed on respondent's net worth and expenditures statement set out above in our findings of fact, with the adjustments indicated and discussed in the following opinion. (References to petitioner's or petitioners' net worth and income hereinafter will be to the net worth and income of Joseph for the year 1959, and to the joint net worth and income of Joseph and Louise for the years 1960 and 1961.) No part of any underpayment of tax required to be shown on petitioners' income tax returns for the years 1959, 1960, and 1961 was due to fraud. Petitioner omitted from gross income reported on his income tax return for 1959 an amount properly includable therein which is in excess of 25 percent of the amount of gross income stated in the return for that year. Opinion Respondent determined the deficiencies in petitioners' income taxes for each of the years here involved by use of the increase in net worth plus nondeductible expenditures method. The use of this method was clearly justified in this case because petitioners failed to keep adequate books and records from which their *149 taxable income could be accurately computed. Sec. 446; Holland v. United States, 348 U.S. 121; Hasson v. Commissioner, 239 F. 2d 778. Petitioners do not seriously argue to the contrary, although they do attack a few of the items contained in respondent's net worth statement. Petitioners' principal argument is that the increase in net worth had its source in nontaxable income, primarily gifts and loans. Respondent's determination is presumed to be correct and the burden is on petitioners to prove wherein it is incorrect, except with respect to the new matters raised in respondent's amendment to his answer. Even if we accepted all of petitioners' arguments with respect to specific items in respondent's net worth statement, which we do not do as shown by the discussion below, we would not be convinced that respondent's determination was so arbitrary or unreasonable as to lose its presumption of correctness except with respect to the particular items successfully attacked. Anderson v. Commissioner, 250 F. 2d 242 (certiorari denied 356 U.S. 950); Banks v. Commissioner, 322 F. 2d 530; Luerana Pigman, 31 T.C. 356. *150 Compare Thomas v. Commissioner, 223 F. 2d 83. Consequently, we agree with respondent's determination of petitioners' taxable income for each of the years involved, with such adjustments as are indicated herein. Petitioners' principal argument with respect to the years 1959 and 1960 is that the indicated increase in net worth resulted from nontaxable gifts to petitioner by his employer, Frank Mortellaro. Petitioner claims that in 1959 Mortellaro gave him $4,335 to buy an automobile, gave him cash which he deposited in his savings account at the First National Bank of Denver in two separate deposits of $500 and $450, and also gave him $5,000-$6,000 in cash at various times throughout the year; and that these amounts total more than respondent's increase of $9,338.71 [3] in petitioners' taxable income for 1959. Petitioners also claim that in 1960 Mortellaro made two cash gifts of $1,000 each to petitioner which he deposited in his bank account, that at Mortellaro's request petitioner deposited $4,269.77 of Mortellaro's funds in petitioner's bank account which Mortellaro informed him on his deathbed was his to keep, and that before Mortellaro died in November 1960 he gave *151 petitioner an additional $1,400 in cash to provide for his burial expenses. According to petitioner these cash gifts accounted for $7,669.77 of respondent's $9,364.22 increase in petitioners' taxable income for 1960. These claims are based on petitioner's self-serving testimony, which is not supported by any record evidence, except, in most instances, deposits of cash in petitioner's bank accounts, and on the testimony of petitioner's father and one of his friends to the effect that they saw Mortellaro give cash to petitioner at various times. The latter witness gave the examining revenue agent a sworn affidavit during the investigation in which he stated that he did not know of any gifts Frank Mortellaro made to anyone, and that "Joe Micciche" never mentioned receiving any gifts from Frank Mortellaro. Of course the testimony of the corroborating witnesses with respect to the purpose for which Mortellaro may have handed cash to petitioner was based entirely on hearsay. Opposed to the above evidence are the *152 facts that Mortellaro paid petitioner a salary during each of these years of only approximately $200 per month, on several occasions soon after the years involved petitioner gave written statements in which he indicated that he was either manager or part owner of the business and as such received bonuses or a share of the profits, that Mortellaro apparently never kept any record of, or reported for gift tax purposes, any gifts made to petitioner, and petitioner apparently did not report to the representative of Mortellaro's estate that he had received any gifts from, or had any funds belonging to, Mortellaro. We are far from convinced by the evidence that petitioner received any gifts from Mortellaro given with the "detached and disinterested generosity" "out of affection, respect, admiration, charity or like impulses" required by Commissioner v. Duberstein, 363 U.S. 278, to make them nontaxable for income tax purposes. We do believe that petitioner received funds, in addition to his salary, from either Mortellaro or the Golden Buffet business during the years 1959 and 1960, and that this was the most likely source of the unquestioned increase in his net worth, but for *153 purposes of this case we need not determine whether he received them as bonuses, a share of the profits, or otherwise. Petitioner has not shown that these funds were not taxable as income. A large part of respondent's increase in petitioners' adjusted gross income for 1961 ($13,679.97) is claimed by petitioner to have resulted from a loan of $10,000 from Louise's brother Les Newton during the year 1961 which had not been repaid at the end of the year and should have been included in respondent's net worth statement as a liability at the end of that year. Petitioner Joseph testified that Newton gave him the $10,000 in cash "A couple of times during the year 1961," and that he could not recall whether he put it in the bank or in the business. Petitioner Louise testified Newton gave her the $10,000 in cash in December 1961, which she gave to Joseph to use in the business. Both petitioners testified that no note was given to Newton as evidence of the debt, that Newton did not ask for any interest, and that none of the amount had been repaid to Newton up to the time of the trial. Newton did not testify; petitioner testified that Newton was out of town, although he acknowledged that Newton *154 returned to Denver frequently. The inconsistency in the testimony of petitioners, the fact that their self-serving testimony was uncorroborated by either Newton or any written evidence, the unlikelihood that Newton would lend even his sister that sum of money for use in a business without some evidence of the debt or security therefor, the fact that neither petitioner testified what was done with the money, and the fact that petitioner did not mention this indebtedness either to the revenue agents when asked about his liabilities during the course of their investigation or on his application for a loan from the Silver State Savings & Loan Association, dated March 26, 1962, all convince us that this loan was more imaginary than real. We have only petitioner's testimony that Newton was even in a financial position to loan them $10,000 in cash. Furthermore, while it may have been a misnomer, petitioner testified that he sold Les Newton a 1950 Plymouth in 1959 for $250 which he was never able to collect and which was a bad debt. We think there must have been better evidence of this loan if it was real. Petitioners have failed to carry their burden of proof on this item. We turn now *155 to the other specific items on respondent's net worth statement questioned by petitioners. The first is a loan receivable from Fred Bergamo which respondent included as an asset at the end of 1960 in the amount of $400. Petitioner testified that he gave Bergamo his personal check for $400 in 1960 as an accommodation to Bergamo when Bergamo wanted to buy a motor for his car and pay for it with a check, and that Bergamo gave him $400 in cash at the same time so no amount was due him from Bergamo. Respondent argues that when questioned about this check by the revenue agents petitioner told them this $400 was not repaid to him until 1961, but we find no evidence in the record to support this argument. Bergamo did not testify and no explanation is given why Bergamo did not deposit the $400 cash in his own bank account and pay for the motor with his own check. Nevertheless, lacking evidence to rebut petitioner's testimony, we hold for petitioner on this item. Next is a loan receivable from James Brady which respondent included in his net worth statement as an asset at the end of 1960 in the amount of $686. Petitioner admits that he loaned this amount to Brady in 1960 which was not paid *156 back in 1960 but claims the debt became uncollectible and a bad debt in 1960. On cross-examination petitioner stated that he loaned Brady additional sums in 1961 and that Brady gave him a note for $1,900 in March 1961, which represented an amount still owed to him at the end of 1961. On the strength of this testimony respondent filed an amendment to his answer asking for an increased deficiency for 1961 resulting from the inclusion of this $1,900 item as an additional asset in his net worth computation. On the evidence presented we cannot conclude that the debt had no value at the end of 1960; on the other hand it is pretty clear from the evidence that Brady used these advances in a losing venture, and there is no evidence that the note or debt had any value at the end of 1961. We sustain respondent's original determination with respect to this item, but will not allow his request for an additional deficiency for the year 1961 resulting from the inclusion of this item as an asset of petitioners at the end of 1961, with respect to which request respondent had the burden of proof. There are several items in respondent's net worth statement concerned with petitioner's purchase of the *157 Log Cabin Inn and payments of the purchase price therefor. Respondent claims that petitioner acquired the property in December 1960 for a purchase price of $22,500. On his original net worth respondent allocated the purchase price by including in petitioners' assets at the end of 1960: $1,000 as inventory, Log Cabin Inn; $6,281.96 as depreciable assets; $944.50 as prepaid rent and liquor license; $1,141.75 as deferred interest and loan costs; and the balance of $13,155.05 as goodwill. (These figures actually total $22,523.26.) Respondent also included as a liability in petitioners' net worth at the end of 1960, the amount of $14,000 due Fred Kentz as a part of the purchase price. Respondent included no amounts as liabilities for sums due either Prande or Murray Bros. on the purchase price at the end of 1960. Respondent reduced the liability due Fred Kentz to $11,561.02 at the end of 1961 as a result of payments petitioner made on the note to Kentz during 1961. Respondent also acknowledges that petitioner paid Prande $2,600 and Murray Bros. $2,000 for Prande on the purchase price during 1961. However, instead of setting up the latter amounts, totaling $4,600, as liabilities of petitioners *158 at the end of 1960, respondent simply added the $4,600 to the goodwill of Log Cabin Inn as an asset of petitioners at the end of 1961, on the theory, as we understand it, that these payments were contributions of additional capital to the business. By amendment to his answer respondent also claims that the correct amount of the liability to Kentz should be $14,500 at the end of 1960 and $10,900 at December 31, 1961, based on an entry in the books of the Log Cabin Inn. While we do not believe it will make much differences in petitioner's overall tax liability, except possibly to transfer some income from one year to the other, based on the evidence presented we think respondent was in error in handling this transaction on the net worth statement. We have found that the purchase of the Log Cabin Inn by petitioner took place on December 31, 1960, and that the purchase price was $22,500. In our opinion the transaction should have been set up on the net worth computation as follows. As of December 31, 1960, petitioners' net worth should have included assets totaling $22,500 representing petitioner's interest in the Log Cabin Inn. Of this amount $1,000 should be allocated to inventory; *159 $6,281.96 to depreciable assets; $13,155.05 to goodwill; $944.50 to prepaid rent and liquor license; and $1,141.75 to deferred interest and loan accounts. (While we recognize that these total slightly more than $22,500, petitioners do not question these items as of December 31, 1960, and possibly the additional $23.26 was added to one of the latter two items extraneous of the purchase of the business.) The purchase price was to be paid by petitioner assuming a debt to Kentz for $14,000, and by payment of the balance to Prande, or for his account, in cash. Petitioner made no payments on the indebtedness to Kentz in 1960 and presumably gave Kentz a note for $14,000 dated either December 31, 1960, or January 1, 1961. Petitioners' net worth as of December 31, 1960, should include as a liability an account or note payable to Kentz in the amount of $14,000. The evidence indicates that petitioner paid $500 cash to Prande at the time the contract was entered into and also paid Prande $2,500 by check dated December 29, 1959. No other payments appear to have been made on the purchase price to, or for the account of Prande, prior to 1961, so as of December 31, 1960, petitioners' net worth should *160 include a liability of $5,500 to Prande for the balance of the purchase price. This would include the liability of $600 which respondent has set up as a note payable to Service Loan Co. in his net worth computation as of December 31, 1960. During the year 1961, the evidence indicates that petitioner made regular payments on the note to Kentz, and also made additional payments on the purchase price of the business to or for the account of Prande. In his original net worth respondent set up a liability of $14,000 to Kentz as of December 31, 1960, and reduced this to $11,561.02 as of December 31, 1961. By amended answer respondent claims the two figures should have been $14,500 as of December 31, 1960, and $10,900 as of December 31, 1961, based on an entry appearing somewhere in the books of Log Cabin Inn. We do not think there is sufficient evidence to justify changing respondent's original figures on this liability item, so they should remain as contained in respondent's original net worth computation. Also during the year 1961, the evidence indicates that petitioner, or Log Cabin Inn, paid $600 to John Downing-Service Loan Co. for the account of Prande, by check dated January 9, 1961; *161 paid $2,000 to Murray Bros. for the account of Prande by check dated January 5, 1961; and paid Prande the following amounts by checks dated as follows: January 13, 1961 - $900; January 31, 1961 - $1,000; February 4, 1961 - $250; February 20, 1961 - $100; and March 7, 1961 - $350. All of the above checks total $5,200, which the evidence indicates was all except $300 of the balance due Prande on the purchase price as of December 31, 1960. Therefore, the $5,500 liability to be included in the net worth computation as being due to Prande (including the $600 liability to Service Loan Co.) as of December 31, 1960, would be reduced to $300 in the net worth statement as of December 31, 1961. The only other item involved in this transaction about which there is any dispute is respondent's increase in the Log Cabin Inn goodwill from $13,155.05 as of December 31, 1960, to $17,755.05 as of December 31, 1961. We believe respondent was in error in this adjustment and that the goodwill item should remain as $13,155.05 as of December 31, 1961. In his net worth computation respondent determined that petitioners had an asset of cash on hand in the amount of $4,000 as of the beginning and end of *162 each of the years 1959, 1960, and 1961, based on a statement made by petitioner during the course of respondent's investigation to the effect that he had about $3,000-$4,000 cash on hand as of January 1, 1959, and about the same amount at the end of each of those years. Of course this consistent use of cash on hand in the same amount at the beginning and ending of each of the years involved does not increase or decrease petitioners' income for any of the years computed on a net worth basis. Petitioner testified at the trial, however, that he was cash "broke" at the end of 1961 and that the cash-on-hand item as of December 31, 1961, should be zero, thus reducing his income by $4,000 for 1961 computed on the net worth basis. This testimony of petitioner is self-serving, not subject to verification, is inconsistent with petitioner's prior statements to the revenue agents, and is inconsistent with the financial statement he gave the Silver State Savings & Loan Association in applying for a loan on March 26, 1962, and we cannot give it any probative value. Based on the evidence as a whole we would be inclined to believe that petitioner may have had more cash on hand at the end of the net *163 worth period than he had at the beginning. We sustain respondent on this issue. Petitioner offered vague evidence on the useful life for purposes of depreciation of a rental property owned by petitioner, located at 6240 West 44th Avenue, Denver, but makes no argument with respect thereto on brief. In any event there is insufficient evidence to overcome the presumptive correctness of respondent's determination of the useful life of this property. In his original net worth computation respondent included a liability from petitioner to the North Denver Bank as of December 31, 1959, in the amount of $605.03, with a zero balance as of December 31, 1960. Based on rather conclusive evidence received at the trial which showed that petitioner was merely an accommodation endorser on the note to the bank for Herbert Fedrizzi and that Fedrizzi paid the note in full during 1960, respondent amended his answer to ask that this item be eliminated from the net worth computation entirely. Petitioner does not argue to the contrary. We sustain respondent with respect to this item and it will be eliminated from the net worth computation. We believe the above discussion disposes of all issues raised *164 by both parties with regard to the net worth computation. Consequently, the parties will recompute the taxable income of petitioners for the years here involved under Rule 50 of this Court, using respondent's net worth statements and computations received into evidence and set out in our findings of fact, with such adjustments as are indicated above, as the basis therefor. Respondent determined that all or a part of the underpayments of tax required to be shown on petitioners' income tax returns for each of the years here involved are due to fraud, and asserted that the 50-percent addition to tax imposed under section 6653(b) is owing by petitioners. The burden of proving fraud is on respondent and he must do so by clear and convincing evidence. M. Rea Gano, 19 B.T.A. 518; Sidney Cohen, 27 T.C. 221. We find that respondent has failed to carry that burden. Respondent relies on the fairly large amounts of unreported income determined by his net worth computation for each year of the years involved, and various specific actions of petitioner, as proof that petitioners' failure to report all of their income was fraudulent with intent to evade tax. Specifically, *165 respondent argues that petitioner's failure to report income from his used car partnership with Forrest in 1959, and his incorrect entry of the profit made on the sale of one automobile in the records petitioner kept for the business, is strong evidence of fraud. We disagree. The evidence indicates that petitioner probably broke about even on this venture, after writing off Forrest's withdrawal of cash from the business when it terminated. To be sure, petitioner should have filed a partnership return for the business and reported his share of the profits or losses on his own return, but under the circumstances here we do not believe his failure to do so is convincing evidence of fraud. Petitioner kept records of the cost and sales prices of all automobiles bought and sold. There is no evidence of an attempt to conceal this activity. The one faulty entry which respondent points to might well be explained by petitioner's testimony that he had to discount the buyer's note and entered only the net as the proceeds of sale. Respondent claims that petitioner's extensive use of currency during these years, his failure to disclose certain bank accounts to the revenue agents, and his failure *166 to report income from the operation of the Log Cabin Inn during the last 2 weeks of December 1960, support his determination of fraud. We find little evidence that petitioner used cash extensively, except cash run through his bank accounts which appears to have resulted from the operation of the businesses. It is not clear from the evidence that petitioner understood when asked by the revenue agents in 1962 that they were inquiring about bank accounts he had had in 1959-61 which had been closed out before 1962. And we have found that petitioner only operated the Log Cabin Inn for Prande during December 1960 and did not become entitled to the income therefrom until 1961. Finally, respondent argues that petitioner's failure to report the amounts he took out of the Golden Buffet business or from Mortellaro proves petitioner's fraudulent intent. It is true that consistent and repeated omissions of substantial amounts of income from tax returns is evidence of fraud, Schroeder v. Commissioner, 291 F. 2d 649, but that alone is not conclusive. As heretofore stated, we think the Golden Buffet business was the most likely source of petitioner's unreported income for the years *167 1959 and 1960, and that that income was taxable to petitioners, but there is little or no evidence that would prove that petitioner knew that the income was taxable to him. The evidence indicates that Mortellaro had known petitioner most of his life, was fond of him and treated him somewhat like a son, and that there was some sort of a loose arrangement between them that permitted petitioner to take funds out of the receipts of the Golden Buffet. Unfortunately Mortellaro was not available to testify with respect to this arrangement. Petitioner testified that the amounts he took were gifts from Montellaro, and hence he considered them nontaxable. We were not convinced by the evidence that these were gifts that would qualify for nontaxability as income. But neither are we convinced from the evidence that petitioner knew this and deliberately omitted the income from his returns for the purpose of evading tax. It would appear that petitioner either deposited most of these receipts in his bank accounts or used them to purchase tangible assets, and there was no evidence of the efforts to conceal that so often accompany efforts to evade taxes. We conclude that respondent has failed to prove *168 fraud by the clear and convincing evidence required. We sustain petitioners on this issue. Petitioner claims that the statute of limitations bars assessment and collection of any deficiency there may be in tax for the year 1959, absent proof of fraud. Petitioner's tax return for 1959 was filed on or before April 15, 1960. The notice of deficiency for 1959 was dated April 13, 1964, more than 3 years after the return was due, and this would be without the normal 3-year statutory period of limitation. Sec. 6501(a). It is clear that the correct adjusted gross income of petitioner for the year 1959, as determined herein by the net worth and expenditures method, which should have been reported on petitioner's return but was not, is in excess of 25 percent of the amount of gross income stated in petitioner's return for that year, and it seems obvious that a large part of the understatement of adjusted gross income resulted from the omission of gross income. The situation here is not similar to the situation existing in H. A. Hurley, 22 T.C. 1256, wherein the majority of this Court held that proof by the net worth method that unreported net income exceeded 25 percent of reported *169 gross income did not necessarily prove that the taxpayer omitted an equal or greater amount of gross income, because the computation of increased net income on the net worth basis may have resulted by reason of claimed deductions having no factual basis. [4]
Here the gross income stated in petitioner's return for 1959 was not in excess of $4,013.03 (the total wages reported on the return plus $900 gross rentals reported on the return). The only deductions claimed on the return were $1,014.89 of rental expense (including depreciation) and itemized deductions of $624.27 (which would not enter into the computation of adjusted gross income or gross income in any event). While we have not computed petitioner's increase in net worth and adjusted gross income for the year 1959 precisely, it would appear that the corrected adjusted gross income would *170 approximate the $12,483.19 computed by respondent in his notice of deficiency. This would reflect at least $8,470 more adjusted gross income than the gross income reported by petitioner on his return. Even if this difference resulted from disallowance of all of the deductions claimed by petitioner on his return, the balance of the difference, approximately $6,800, would result from omissions of gross income in an amount equal to more than 100 percent of the gross income reported. See H. Leslie Leas, 23 T.C. 1058. In addition, it would appear that, under section 6501(e)(1)(A)(i) and (ii), the amount of gross income omitted by petitioner would include his share of the gross receipts on the used car business he conducted with Forrest, which would be at least $3,000. Also, petitioner contends that the increase in net worth for 1959 came from nontaxable gifts, which under our ruling would be gross income. Consequently, it is relatively certain that petitioner omitted more than 25 percent of the gross income that should have been reported on his return. We conclude that respondent has carried his burden of proof on this issue, that the 6-year statute of limitations provided *171 in section 6501(e)(1) is applicable, and that assessment and collection of the deficiency for 1959 is not barred by the statute of limitations. Decision will be entered under Rule 50. Footnotes
1. All statutory references are to the 1954 Code unless otherwise indicated.↩
2. The chattel mortgage refers to a note of even date for $14,000, payments on which were to be made at the rate of $300 per month, including interest, beginning on February 1, 1961. Neither the note nor an admissible copy thereof was offered in evidence.↩
3. The actual increase in petitioner's taxable income determined by respondent was $8,764.84, the $9,338.71 being the adjusted taxable income as determined by respondent.↩
4. Whether the rationale of H. A. Hurley, 22 T.C. 1256, would apply under present law, which defines section 6501(e)↩ gross income, in the case of a trade or business, as the total of the amounts received or accrued from the sale of goods or services prior to diminution by the cost of such sales or services, we need not decide.