223 F.2d 83
 55-1 USTC P 9509
 Anthony V. THOMAS, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
ESTATE of Joseph M. THOMAS, Deceased, Anthony V. Thomas,
Administrator, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
George J. THOMAS, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent (two cases).
 Nos. 12175-12178.
 United States Court of Appeals Sixth Circuit.
 June 14, 1955.
 
 Everett H. Davidson, Lorain, Ohio, O. D. Eshelman, Cleveland, Ohio, on brief, for petitioners.
 S. Dee Hanson, Washington, D.C., H. Brian Holland, Ellis N. Slack, Washington, D.C., on brief, for respondent.
 Before MARTIN, McALLISTER and STEWART, Circuit Judges.
 STEWART, Circuit Judge.
 
 
 1
 Anthony V. Thomas, Joseph M. Thomas and George J. Thomas were brothers engaged in the operation of a number of partnership enterprises in Lorain, Ohio, until the death of Joseph Thomas on September 17, 1949, aboard the steamship 'Noronic.' Upon his death, more than $180,000 in cash was found in his safe deposit box. That discovery occasioned an investigation by Internal Revenue agents of the income tax returns filed by the three brothers during the immediately preceding years. That investigation, in turn, led to separate determinations by the Commissioner that they had failed to report income in the total amount of $232,882.11 for the years 1946 to 1949, inclusive, resulting in income tax deficiencies of $113,620.55 for those years. The Commissioner's determinations were upheld by the Tax Court, and Anthony, George, and the Estate of Joseph Thomas are petitioners here in an effort to set aside the Tax Court's decisions.
 
 
 2
 In determining that the taxpayers had understated their taxable incomes for the four years in question, the Commissioner utilized the now familiar method of computing the increases in the net worth of the taxpayers in each of the four years, adding to those increases the taxpayers' nondeductible expenses in each year, and thereby circumstantially reconstructing their incomes for each year.
 
 
 3
 The petitioners list in their brief sixteen separate questions allegedly involved on this review. These so-called questions are stated in a repetitive, overlapping, partial, and argumentative form, and upon examination, the two basic questions which emerge are: (1) whether or not the Commissioner was warranted in resorting to the net worth method of proving taxable income under the circumstances in these cases, and (2) whether or not the worth computations as made, which are the basis of the Commissioner's determinations and the Tax Court's redeterminations, were clearly erroneous.
 
 
 4
 As to the first question, we think the Commissioner was not unjustified in resorting to the net worth method of reconstructing the petitioners' incomes under the circumstances revealed by the record. Those circumstances, commencing with the death of the petitioners' father in 1924, are reviewed at length in the memorandum opinion of the Tax Court (Paragraph 53,346 Prentice Hall, Memo. T.C.), and no useful purpose would be served by repeating them here in detail. The record shows that the taxpayers during the taxable years involved owned and operated several income producing businesses, the Thomas Grill, the Thomas 333 Bar, and Thomas Properties, Inc. They also were engaged in purchasing and renting real estate, and lending money on mortgages and notes. In addition, Joseph Thomas was engaged as an individual in stock market transactions, and George Thomas was working for wages.
 
 
 5
 The income tax returns for the taxpayers for 1946 were prepared by an accounting firm. The books of the taxpayers for that and prior years were destroyed in 1947 by a fire. During 1947, 1948, and 1949, a different firm of accountants kept certain books for the 333 Bar and the Thomas Grill, and prepared the tax returns for the taxpayers and their partnerships. The entries made in the books were based upon data supplied by Joseph Thomas. These entries accurately reflected the data submitted, which included cancelled checks, check stubs, bank statements, and petty cash items. The entries made with respect to the receipts for the businesses were made from slips on which were listed summaries of the daily receipts. The accounting firm did not verify the accuracy of the amounts appearing on the slips, nor did it verify the amounts of opening or closing inventories as supplied by Joseph Thomas. No ledger was maintained nor were any ledger accounts kept with respect to assets or liabilities. No records were maintained concerning any cash on hand, except petty cash and the amounts in the cash registers. No formal books were kept with respect to the loans made by Joseph Thomas. He did keep a card index which contained sufficient information to identify the debtor, and the date and amount of the loan.
 
 
 6
 The partnership returns filed by the 333 Bar for the years 1946, 1947, and 1948 showed Joseph and Anthony Thomas as the partners, with distributive shares of twenty per cent and eighty per cent respectively. The partnership returns filed for the Thomas Grill for 1946 and 1947 showed Joseph and George Thomas as the partners, with distributive shares of sixty per cent and forty per cent, respectively. During 1948 George, because of a pending divorce suit, concealed his connection with the business enterprises conducted by him and his brothers. Thereafter, so far as the records of the businesses show, George had no interest in any of the enterprises, and no partnership return was filed for the Thomas Grill for 1948. Only Joseph Thomas reported income from that business for that year, even though George actually continued to own an interest in the business and admitted that by not reporting any income from the Grill for 1948 he substantially understated his income for that year.
 
 
 7
 During the course of the administration of Joseph Thomas' estate, the question of the ownership of the money found in Joseph Thomas' safe deposit box, of the 333 Bar, of the Thomas Grill, and of certain loans made by Joseph Thomas was litigated. Joseph, George and Anthony Thomas were each adjudged the owners of a one-third interest therein.
 
 
 8
 Upon a consideration of the method by which the taxpayers had operated and had reported income, and finding that during 1948 the expenditures, investments, and bank deposits of the taxpayers greatly exceeded the incomes reported by them for that year and also exceeded their incomes from disclosed sources, and further finding that no record had been maintained with respect to undeposited cash on hand, which was part of the stock-in-trade of their loan business, the Commissioner concluded that the taxpayers' books and records did not correctly reflect their incomes for the years 1946 through 1949. In accordingly resorting to the net worth method, the Commissioner constructed a comparative year-end net worth schedule which included all the taxpayers' known jointly owned assets for the five-year period 1945 through 1949, and the resulting year-end joint net worth figures were then divided by three, which gave the separate net worth computations made for each of the individual taxpayers. To each of the taxpayers' joint net assets thus ascertained, the Commissioner added the separately owned assets of each, thus determining the yearly increase in net worth of each taxpayer for each of the taxable years involved. To the latter resulting figures, the Commissioner added certain known personal expenditures, including income taxes paid, and estimated amounts for living expenses for each taxable year. The Commissioner allowed as subtractions from the amounts thus arrived at, all permissible deductions taken by the taxpayers in their tax returns filed for the years in question.
 
 
 9
 The petitioners contend that the Commissioner was unwarranted in using the net worth method of computing their income because they did keep certain records of their various business activities, because their income tax returns for the years in question accurately reflected the cash register tapes and other business records turned over to the accounting firm by Joseph Thomas, and because the Commissioner failed to prove any additional source of income. These contentions are not enough. The fact that the taxpayers' books and other records were consistent with their income tax returns proves nothing more than that they were consistent; it does not establish that they were truthful. Similarly, the failure of the Government to find any source of the alleged unreported income does not necessarily establish anything more than that the source was well-hidden. Nor does the fact that books and records were kept prevent the Commissioner from resorting to the net worth method if he properly determined that those books and records did not accurately reflect the taxpayers' true income. That was expressly decided in Holland v. United States, 1954, 348 U.S. 121, 131, 75 S.Ct. 127, a criminal case. There is no reason why use of the net worth method should be more circumscribed in the case of a deficiency determination, involving neither criminal nor even civil fraud penalties.
 
 
 10
 We conclude therefore that the Tax Court was correct in finding that the respondent Commissioner did not err 'in determining that the books and records maintained by petitioners for the years in controversy did not correctly reflect their income and in further determining that the income of the petitioners was to be computed on the basis of their increases in net worth, plus other items for the respective years.'
 
 
 11
 The petitioners take issue with several aspects of the net worth computations as actually made by the Commissioner and upheld by the Tax Court. Some of the petitioners' contentions raise entirely factual questions, as to which we cannot say that the findings of the Tax Court were clearly erroneous. Specifically, we think the Tax Court was not in error in finding that the Broadway Recreation Bowling Alley and the mortgage note acquired upon the sale of that property in 1947 constituted assets belonging jointly to Anthony and Joseph Thomas, rather than to all three brothers. We are also of the view that the Tax Court was not in error in upholding the Commissioner's determination that Joseph Thomas had taken $5,000 with him when he went on the 'Noronic' trip in the fall of 1949.
 
 
 12
 Others of the petitioners' contentions seem to result from a misconception of the net worth method of reconstructing taxable income. For example, the Tax Court sustained the Commissioner's action in adding to their net worth increases each year the taxpayers' estimated annual living expenses, and the income taxes actually paid by them in each year. We think that petitioners' attack upon these actions of the Commissioner are not meritorious. These computations were an inherent and necessary part of the net worth method of recomputing the taxpayers' income. Cf. Holland v. United States, 348 U.S. at page 125, 75 S.Ct. at page 130. Nor do we think that the Commissioner's estimates of the taxpayers' annual living expenses, ranging from $2,400 for Anthony Thomas to $4,000 for Joseph Thomas, were unreasonable. In short, as to all the subsidiary issues raised by the petitioners, we are of the view that the Tax Court's disposition of them was not in error.
 
 
 13
 However, the petitioners' basic attack upon the net worth computations made by the Commissioner and upheld by the Tax Court is upon the determination of the amounts of the petitioners' cash on hand at the end of the years 1945, 1946, 1947, 1948, and 1949. Of the alleged total unreported income of approximately $230,000 during the years involved, more than $160,000 was determined by the Commissioner upon the basis of his findings as to the taxpayers' cash on hand at the end of each of these calendar years. In making his computations, the Commissioner determined that, of the more than $180,000 in cash found in the safe deposit box of Joseph Thomas after his death, all but some $17,000 had been accumulated after 1945, in the approximate amounts of $23,000 in 1946, $18,000 in 1947, $57,000 in 1948, and $65,000 in 1949.
 
 
 14
 In the Tax Court petitioners attacked these determinations of cash on hand broadly along two lines. First, they attempted to show that the amount of money in the safe deposit box was in fact larger than $180,000 at the beginning of 1946, and, secondly, they sought to show that the Commissioner's determination as to the amounts of cash on hand at the end of each of the years 1945 through 1949 was in any event without foundation and completely arbitrary.
 
 
 15
 Petitioners offered certain computations in an effort to show that their cash on hand prior to 1946 exceeded $180,000 and introduced some oral evidence to buttress their claim. We think that the Tax Court was not in error in finding the petitioners' computations invalid and in disbelieving the testimony introduced. Petitioners argued that since they reported income of approximately $100,000 during 1943, 1944, and 1945, and only $30,000 was added to their bank accounts, the remaining $70,000 must have been put in the safe deposit box during those years. In addition to ignoring the amount of money petitioners must have used to pay taxes and their living expenses, this argument also overlooked the fact that petitioners acquired other new assets worth approximately $80,000 during that period. Petitioners in another computation attempted to show that a fund of $240,000 in cash existed in 1945. Yet, in making this computation, it was implicitly assumed that they received no unreported income after that date from which additions could have been made to the fund. Since that assumed the answer to the very question here in issue, the computation had no probative value.
 
 
 16
 George and Anthony Thomas testified that the three brothers had about $180,000 in cash and $60,000 worth of whiskey during the war, and that by the end of the war the whiskey had nearly all been sold, leaving them approximately $240,000 in cash by the end of 1945. Anthony stated that he had helped put $150,000 in the safe deposit box prior to 1946. This testimony was completely inconsistent with his own prior statement to Ohio tax officials that he knew nothing at all about the amount of money in the box. The credibility of George's testimony was weakened by his admission that he had consciously failed to report any of his share of the profits for 1948, in order to conceal assets from his wife who was in the process of obtaining a divorce. Moreover, there was no real explanation offered as to how this claimed amount of cash came into being. During the years 1939 to 1942 petitioners reported only small amounts of income, and the evidence of petitioners' borrowing money in connection with certain transactions during those years pointed to the absence, rather than the presence, of a large accumulation of cash. For these reasons the Tax Court could, as it did, decline to credit petitioners' testimony. Quock Ting v. United States, 1891, 140 U.S. 417, 11 S.Ct. 733, 851, 35 L.Ed. 501.
 
 
 17
 Other evidence introduced, such as the dates of entry into the safe deposit box, the dates of release of some of the larger bills found in it, and testimony of third persons of having seen 'a substantial amount' of money in petitioners' possession, was equally as consistent with the Commissioner's position as with petitioners', and none of it afforded ground for establishing even an approximate amount of cash in petitioners' possession on the critical dates involved.
 
 
 18
 The petitioners strenuously argue however that even if their evidence was disbelieved, still the Commissioner's determinations of their cash on hand at the end of 1945 and the subsequent years were completely arbitrary and incorrect. In considering this contention we are, of course, mindful that these determinations were presumptively correct, and that the Tax Court's decisions upholding them are conclusive unless clearly erroneous. 26 U.S.C. § 1141; Rule 52(a) Federal Rules of Civil Procedure, 28 U.S.C.A.
 
 
 19
 By contrast, the four net worth cases recently considered by the Supreme Court, and many of the net worth decisions of the lower federal courts cited by petitioners, were criminal cases, where the presumption was in favor of the taxpayers, and the Government had the obligation of establishing their guilt beyond a reasonable doubt. Holland v. United States, 1954, 348 U.S. 121, 75 S.Ct. 127; Friedberg v. United States, 1954, 348 U.S. 142, 75 S.Ct. 138; Smith v. United States, 1954, 348 U.S. 147, 75 S.Ct. 194; United States v. Calderon, 1954, 348 U.S. 160, 75 S.Ct. 186.
 
 
 20
 Yet, although the petitioners here had the burden of proving that the Commissioner's determinations were wrong, if they did so, it was not incumbent upon them to prove that they owed no tax, or what was the tax that they did owe. Taylor v. Commissioner, 2 Cir., 1934, 70 F.2d 619, 621, affirmed Helvering v. Taylor, 1935, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623.
 
 
 21
 'Where it is apparent from the record that the Commissioner's determination is arbitrary and excessive, the taxpayer is not required to establish the correct amount that lawfully might be charged against him, and he is not required to pay a tax that he obviously does not owe. In proceedings before the Tax Court, as distinguished from suits for refund in the District Court, it is sufficient to show that the Commissioner's determination is invalid. Upon such a showing the case should be remanded to the Tax Court for further hearings on the point involved.' Durkee v. Commissioner, 6 Cir., 1947, 162 F.2d 184, 187, 173 A.L.R. 553. See Boston & M.R.R. v. Commissioner, 1 Cir., 1953, 206 F.2d 617, 626.
 
 
 22
 The Commissioner's determinations of the taxpayers' cash on hand at the end of each of the years 1945 through 1948 were, of course, vital to his determinations of the petitioners' opening net worth for the year 1946, the first of the taxable years involved, and for each of the following three taxable years. In Holland v. United States, supra, 348 U.S. at page 132, 75 S.Ct. at page 134, it was said 'We agree with petitioner that an essential condition in cases of this type is the establishment, with reasonable certainty, of an opening net worth, to serve as a starting point from which to calculate future increases in the taxpayer's assets. The importance of accuracy in this figure is immediately apparent, as the correctness of the result depends entirely upon the inclusion in this sum of all assets on hand at the outset.'
 
 
 23
 The vital importance of accuracy in the determination of opening net worth for the taxable year involved had previously been recognized by this court in net worth cases. 'To be dependable, however, the method requires a starting point, reasonably well established as accurate.' Gariepy v. United States, 6 Cir., 1951, 189 F.2d 459, 461. "Net worth of the taxpayer at the beginning of the tax year must be clearly and accurately established by competent evidence." Brodella v. United States, 6 Cir., 1950, 184 F.2d 823, 825.
 
 
 24
 Despite the essential difference between the burden of proof in a criminal case and that in a Tax Court deficiency determination, we see no reason why the determination of opening net worth should be any less vital to the validity of the method of computation invoked in the one type of case than in the other.
 
 
 25
 The findings of the Commissioner as to the amounts of cash on hand which petitioners had at the beginning of each relevant tax year were based in this case on only one thing: an agreement between Anthony Thomas and a tax official of the State of Ohio. Shortly after the death of Joseph Thomas in the fall of 1949, Anthony, as administrator of Joseph's estate, opened Joseph's safe deposit box in the company of a deputy auditor of the State of Ohio. It was then that the $180,479 in cash first came to light. In his Ohio Personal Property Tax returns Joseph Thomas had reported no undeposited cash on on hand on January 1 of the years 1946 and 1947, and only $550 and $500 on January 1 of the years 1948 and 1949, respectively. A representative of the Ohio State Tax Commission, Harold B. Herron, made an appointment with Anthony Thomas and Anthony's attorney to discuss the matter. He requested that the attorney 'get together all the information that he could assemble as to when this money might have gone into the safety deposit box.'
 
 
 26
 At the appointed meeting, Anthony stated that he knew nothing about the amount in the safe deposit box until it was opened after Joseph's death. His attorney said he knew no more. The attorney exhibited the records of certain dwindling bank accounts of the partnership, which led Herron to infer that the cash in the box had been built up by withdrawals from those accounts. However, neither the records nor even the existence of a number of other assets (including outstanding loans and other bank accounts) which had clearly increased during the same period, were made known to Mr. Herron. The bank account records which were exhibited to Mr. Herron at this meeting showed no deposits after March, 1945, and from this Mr. Herron and the attorney 'assumed by agreement' that the safe deposit cache had its origin as of that time. As a matter of fact, many other bank deposits were made after that date in other accounts, but the fragmentary data shown Mr. Herron did not reveal this.
 
 
 27
 Mr. Herron thus decided (1) that no money was put into the safe deposit box until March, 1945, and (2) that beginning at that time the accumulation of cash was built up by bank withdrawals to the extent that there were such withdrawals. By crediting the accumulation in the safe deposit box with accumulations at the times and in the amounts there were bank withdrawals, and then pro rating the balance of the $180,000 over the period March, 1945 to August, 1949, Herron and the attorney arrived at a schedule of amounts in the safe deposit box on January 1 of the years 1946, 1947, 1948, and 1949.
 
 
 28
 Anthony, as administrator of the Estate of Joseph Thomas, filed Ohio Personal Property Tax returns for 1946 and 1947 on that basis and agreed to Mr. Herron's correcting the 1948 and 1949 returns in accordance with these computations. The entire meeting took only an hour and a half or two hours.
 
 
 29
 Herron testified in the Tax Court that his sole purpose was to put the safe deposit box cash on some personal property tax return. He readily admitted that his computations were inaccurate and hurriedly made, that he knew nothing at that time about the loans or investments, nor about two safes kept by the taxpayers at their places of business, but that he would have been concerned if he had known of these facts, and that his computations would have then been different. He stated that the figures he arrived at were necessarily estimated by him, because it would have taken several months to have made accurate computations.
 
 
 30
 Viewed against the fuller revelation of all the facts in this case, Herron's calculations were thus nothing but guesswork. They were based upon the two underlying factual assumptions that the accumulation of money in the safe deposit box did not commence until March of 1945, and that the accumulation was built up by bank withdrawals to the extent of such withdrawals. These two basic assumptions were completely without foundation.[1] The fact that Anthony Thomas agreed, in 1950, to the 'correctness' of the figures arrived at during the conference between Herron and the attorney gave those figures no greater probative force, in view of the circumstances described in the record. The fact was that Anthony stated at the time that he did not know when and in what amounts the cash was accumulated, and it was on that basis that he came to the compromise agreement with Herron.
 
 
 31
 The figures arrived at during the conference between Herron and the attorney were the sole support for the Commissioner's determinations of cash on hand at the beginning of the various years involved. Those figures had the inviting quality of apparent exactitude, and it is understandable why the Commissioner seized upon them. 'Bare figures have a way of acquiring an existence of their own, independent of the evidence which gave rise to them.' Holland v. United States, 348 U.S., at page 128, 75 S.Ct. at page 131. Yet these figures were in fact merely arbitrary estimates bottomed upon assumptions shown to be entirely without foundation. Since the Commissioner's determinations of cash on hand for the various years were based entirely upon these figures, his determinations must fall, and the cases must be remanded to the Tax Court to determine the amounts of cash on hand which the petitioners had at the beginning of the year 1946 and of the three subsequent years.
 
 
 32
 It is recognized that such determinations may not be in figures as precise as Mr. Herron's convenient computation provided. However, there are lines of evidence even in the present record which suggest the proper approach to the problem, based, for example, upon the statement of Anthony Thomas to the Ohio State Tax Commission that the fund had been accumulated by withdrawing cash from the various businesses of the taxpayers.
 
 
 33
 The decisions of the Tax Court are reversed, and the cases are remanded for the admission of further evidence and for findings as to the petitioners' cash on hand at the commencement and termination of each of the tax years involved.
 
 
 
 [1]
 The safe deposit box was first rented by Joseph Thomas in 1938