MILAN M. VUITCH AND FLORENCE R. VUITCH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Vuitch v. Commissioner
Docket No. 28479-81.
United States Tax Court
T.C. Memo 1985-95; 1985 Tax Ct. Memo LEXIS 536; 49 T.C.M. (CCH) 860; T.C.M. (RIA) 85095; March 4, 1985. *536 Petitioner, Dr. Vuitch, made two deposits totaling $190,750 to an individual bank account. Held, these bank deposits constitute income to petitioners. Held further, petitioners are liable for the addition to tax under sec. 6653(a), I.R.C. 1954. Michael B. Rosenberg,Melville W. Feldman,Robert D. Grossman, Jr. and Paul S. Schleifman, for the petitioners. Ruud L. DuVall, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: By notice of deficiency dated August 26, 1981, respondent *537 determined a deficiency in petitioners' Federal income tax for the taxable year ended December 31, 1975 in the amount of $129,430. Pursuant to section 6653(a), [1] respondent also sought an addition to tax of $6,472. The issues before us are: (1) whether bank deposits totaling $190,750 constitute income to petitioners; and (2) whether petitioners are liable for the addition to tax under section 6653(a). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioner Milan M. Vuitch was a resident of Silver Spring, Maryland at the time of filing the petition in this case. [2] The Federal income tax return for the year 1975 was filed with the Internal Revenue Service Center in Philadelphia, Pennsylvania. Milan M. Vuitch (hereinafter Dr. Vuitch) was born in Ada, Servia, *538 Yugoslavia in 1915. In 1953 he met his future wife, Florence, an American traveling in Europe. After a brief courtship, they were married in Yugoslavia, and in 1955, Dr. Vuitch immigrated to the United States. After immigrating to the United States, Dr. Vuitch eventually set up a medical practice. He opened offices in Maryland and in Washington, D.C. and, in 1962 or 1963, started performing abortions as part of his medical practice. He was arrested in his Washington, D.C. office in 1968 and in his Maryland office in 1968 or 1969 and was charged on both occasions with performing illegal abortions. [3] He was subsequently acquitted of all charges. Following his acquital, Dr. Vuitch continued to perform abortions, the charges for which constituted a substantial portion of his income. On September 30, 1969, Dr. Vuitch entered into an agreement to purchase real property in Laurel, Maryland, where he planned to build a hospital. Laurel Hospital, Inc. (hereinafter Laurel Hospital) was formed for the purpose of building and operating the hospital. [4]
*539 Mr. DeAngeles was hired to do the general contracting work of the hospital. He was a friend of Dr. Vuitch and had done work for the doctor on previous occasions. An architect, John Keegan, was hired to do a feasibility study, design the hospital, and take care of the zoning work. [5] Between late 1969 and 1973, Dr. Vuitch encountered public protests with respect to his plan to build the hospital and did not actively pursue building it. On October 8, 1975, Dr. Vuitch made two deposits totaling $190,750 to an individual checking account established that day. [6] Neither Laurel Hospital's books nor petitioners' books reflect this transaction. In his statutory notice of deficiency, respondent determined that these unexplained bank deposits were additional income to petitioners. *540 OPINION It is well established that, in the absence of adequate books and records, respondent may determine a taxpayer's income by a bank deposits analysis. Sec. 446(b); sec. 1.6001-1(a), Income Tax Regs.; Goe v. Commissioner,198 F.2d 851, 852 (3d Cir. 1952), cert. denied 344 U.S. 897 (1952); Estate of Mason v. Commissioner,64 T.C. 651, 656 (1975), affd. 566 F.2d 2 (6th Cir. 1977). Use of the bank deposits method is proper even when the taxpayer keeps books and records which support his return as filed. Campbell v. Guetersloh,287 F.2d 878, 880 (5th Cir. 1961); Harper v. Commissioner,54 T.C. 1121, 1129 (1970). Respondent is not required to accept a taxpayer's return or his books at face value. Holland v. United States,348 U.S. 121, 130-132 (1954). When respondent uses the bank deposits method to reconstruct income, evidence of the mere making of a bank deposit does not of itself show that the sum deposited was or was not income. Goe v. Commissioner,supra at 852; Reaves v. Commissioner,31 T.C. 690, 717-718 (1958), affd. *541 295 F.2d 336 (5th Cir. 1961). Once respondent has made the determination, however, the taxpayer has the burden of proving that the deposits were not the result of the receipt of taxable income. Mills v. Commissioner,399 F.2d 744, 749 (4th Cir. 1968); Doll v. Glenn,231 F.2d 186, 188 (6th Cir. 1956); Hague Estate v. Commissioner,132 F.2d 775, 776 (2d Cir. 1943), cert. denied 318 U.S. 787 (1943); Estate of Mason v. Commissioner,supra at 657; Rule 142(a), Tax Court Rules of Practice and Procedure. It is not necessary that respondent prove the source of the unidentified income. A failure to show the source proves nothing more than that it was well hidden. Thomas v. Commissioner,223 F.2d 83, 86 (6th Cir. 1955). Petitioner contends that respondent was arbitrary and incorrect in his determination so that he bears the burden of going forward with the evidence. We disagree. When a taxpayer keeps inadequate books and records, has large bank deposits, and offers no plausible explanation for the deposits, respondent is not arbitrary and capricious in resorting to the *542 bank deposits method for computing income. Mills v. Commissioner,supra at 749; Harper v. Commissioner,supra at 1129. Petitioners claim that $190,500 of the $190,570 in bank deposits represented proceeds received from two loans. [7] These loans allegedly were made by International Health Progress, Ltd. (hereinafter IHP), and disbursed by Dr. Staub, who was president of IHP. IHP was a Bahamian corporation, and their offices were located in Switzerland. The evidence shows that Dr. Vuitch and Dr. Staub were mere acquaintances at best. Dr. Vuitch testified that in 1975 he telephoned Dr. Staub requesting money from IHP to finance the start of construction of the Laurel Hospital. The construction was to be financed mostly by Federal loans. On October 7, 1975, Dr. Vuitch went to Switzerland to obtain the requested money. It is petitioners' contention that two loans were made on an uncollateralized basis, one to Dr. Vuitch personally, and one to Laurel Hospital. The *543 proceeds of the loan were paid to Dr. Vuitch in two checks totaling $25,500 and in cash totaling $165,000. Dr. Vuitch argued that it was not unusual for IHP to accept uncollateralized loans from Laurel Hospital or from him personally. He maintained that, on two earlier occasions, Laurel Hospital had borrowed money from IHP on an unsecured basis, which it later had repaid in full with interest. Thus, there was a prior history of IHP making uncollateralized loans to Laurel Hospital. Dr. Vuitch insists that, based upon this prior loan history as well as his and Laurel Hospital's strong financial statements, IHP agreed to lend them $190,500 in 1975. [8]
The first time IHP purportedly lent Laurel Hospital money was in 1969, and the amount of the loan was $37,750. The loan was disbursed by check, which was deposited into Laurel Hospital's bank account. Proceeds of the loan, in the amount of $35,000, were used as a downpayment on the purchase of the Laurel Hospital property. The evidence shows that this transaction constituted a valid loan. Laurel Hospital *544 repaid this loan with interest via checks made payable to IHP. Every check, with one exception, was endorsed by IHP and deposited into its bank account. The second time Laurel Hospital purportedly borrowed money from IHP on an unsecured basis was in 1972. The amount of this loan was $60,000, which was also disbursed by check and deposited into Laurel Hospital's bank account. Dr. Vuitch contends that this loan was also repaid in full with interest. The ewvidence, however, shows that only one of Laurel Hospital's alleged repayment checks was made payable to IHP and endorsed by it. Most of the checks were made payable to Dr. Staub and endorsed by him personally. In addition, one of the checks made payable to Dr. Staub was endorsed by Florence Vuitch, and another check was made payable to cash and endorsed by Dr. Vuitch. The fact that the hospital made some of the checks payable to Dr. Staub instead of to IHP, as well as petitioners' endorsement of some of these checks, casts considerable suspicion upon whether a bona fide loan transaction was entered into between Laurel Hospital and IHP in 1972. Thus, we are not convinced that a valid loan was created in 1972. It should be noted, *545 however, that even if IHP had made two uncollateralized loans to Laurel Hospital that were later repaid, it does not necessarily follow that the 1975 bank deposits represented loan proceeds. As mentioned above, $165,000 of the alleged $190,500 loan was disbursed to Dr. Vuitch in cash. Dr. Vuitch testified that it was not unusual for the loan proceeds to be disbursed primarily in cash because, when he lived in Europe, he always dealt in cash. We are unpersuaded by this testimony. If Dr. Vuitch always dealt in cash, then the previous two loan proceeds would have been disbursed in cash and not by check. In addition, given IHP's prior history of disbursing loan proceeds by check, we find it unbelievable that this $165,000 in cash represented proceeds of a loan executed between IHP and Dr. Vuitch and Laurel Hospital. The events surrounding Dr. Vuitch's return from Switzerland further support our disbelief. Dr. Vuitch returned to the United States from Switzerland on October 7, 1975. When he left Switzerland, he put the cash proceeds of the alleged loan in his pockets, trench coat, and flight bag and boarded his flight. When Dr. Vuitch went through United States Customs, he filed *546 a report of International Transportation of Currency or Monetary Instruments on Form 4790 showing that he was carrying currency into the country in the amount of $65,000. [9] This written report contradicts Dr. Vuitch's statement at trial that, when he returned to the United States from Switzerland, he was carrying currency in the amount of $165,000, which was the proceeds of a loan. [10]
On October 8, 1975, Dr. Vuitch deposited the alleged loan proceeds of $190,500 into a new individual bank account and not into Laurel Hospital's bank account. The purported loan to Laurel *547 Hospital was not recorded on its books. Dr. Vuitch stated that, simultaneously with the deposit of the loan proceeds, he withdrew $70,000 in cash and loaned this amount to Mr. DeAngeles to enable him to proceed to secure material and to make arrangements for the building of the hospital. It is interesting to note that, while this purported loan was evidenced by a promissory note, the note was dated October 2, 1975, six days prior to when the alleged loan transaction occurred. On October 9, 1975, two days after his Switzerland trip, Dr. Vuitch was notified that Federal funding would not be made available to him. Dr. Vuitch contacted Dr. Staub informing him that, since Federal funding would be unavailable, he doubted that he would proceed with building the hospital. At that time, Dr. Vuitch maintains that he told Dr. Staub that Mr. DeAngeles, the hospital's general contractor, needed funds for his construction business. Dr. Staub had never met Mr. DeAngeles.On the basis of Dr. Vuitch's statement that Mr. DeAngeles was financially well off, Dr. Staub allegedly agreed to let Mr. DeAngeles assume all but $500 of the two loans on an unsecured basis, [11] and agreed to release Dr. Vuitch *548 and Laurel Hospital from any obligation on the two loans. It is unfortunate that Dr. Staub was not available to corroborate petitioners' testimony and the documents with respect to the purported loans. Thus, all the Court had was petitioners' uncorroborated self-serving testimony and documents. [12]
*549 We have carefully considered the testimony of petitioners and the uncorroborated documents. We find their explanation given for the bank deposits questionable, to put it mildly. Consequently, we cannot afford any weight to it. Therefore, petitioners have failed to show that the $190,750 was from nontaxable sources. With respect to the addition to tax under section 6653(a), petitioners have the burden of proving that it does not apply. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. Since petitioners offered no evidence on this issue, respondent's determination on this issue is sustained. Decision will be entered for the respondent.
Footnotes
1. All section references, unless otherwise stated, are to the Internal Revenue Code of 1954 as amended and in effect for the year in issue.↩
2. His wife, Florence R. Vuitch, is also a petitioner in this case. They are separated, and she has a different residence.↩
3. Prior to 1973, the Supreme Court had not invalidated abortion laws in Maryland, Virginia and the District of Columbia.↩
4. Dr. Vuitch was, and still is, the president and chairman of the Board of Directors of Laurel Hospital, and Florence Vuitch has been the secretary-treasurer and custodian of all of Laurel Hospital's financial records since 1969.↩
5. Mr. Keegan's services were terminated on August 1, 1973 and the architectural firm of Tatar and Kelly was hired to replace him.↩
6. It should be noted that the IRS agent who audited petitioners' 1975 return requested all of their bank statements. No information was initially provided to the IRS agent with respect to this particular bank account. It was not until the agent said that he had knowledge of additional bank accounts that this information was provided.↩
7. Petitioners claim that $250 of the bank deposits represented miscellaneous cash. The evidence failed to demonstrate that the source of this amount was nontaxable.↩
8. It should be noted that, prior to the loan in issue, IHP had never lent money to Dr. Vuitch in his individual capacity.↩
9. The stated National Policy of the Department of Treasury, United States Customs Service, is that Customs Inspectors accepting Internal Revenue Service Forms 4790 from travelers "should insure that they are filled out correctly." ↩
10. At trial, further doubt was cast upon Dr. Vuitch's credibility as a witness. While he had testified that he and Mr. DeAngeles were close friends, he could not remember where Mr. DeAngeles lived or the town where he did business. Furthermore, Dr. Vuitch testified that he never knew that Mr. DeAngeles had served time in prison, a fact that was later established at trial.↩
11. There was no evidence that Mr. DeAngeles made any payments to IHP with respect to any assumed indebtedness. Prior to the due dates on the alleged indebtedness of Mr. DeAngeles, IHP was removed from the Register of Companies under the provisions of The Removal of Defunct Companies Act. It should be noted that IHP's books did not show as an asset Mr. DeAngeles' alleged indebtedness.↩
12. Mr. DeAngeles died prior to the trial. Mrs. DeAngeles testified that it was her understanding that her husband had borrowed money from Dr. Vuitch. Her testimony was corroborated by the Greensboro District Director's Office, who had done a criminal and civil investigation of Mr. DeAngeles and found that he had been the recipient of $190,000 in loans from Dr. Vuitch. The fact that Dr. Vuitch had lent Mr. DeAngeles $190,000 is irrelevant, however, with respect to whether Dr. Vuitch's receipt of $190,750 was a loan.↩