KAHRAHB RESTAURANT, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent MASSUD RAHBAR AND SOUDAEH RAHBAR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kahrahb Restaurant, Inc. v. Commissioner
Docket Nos. 20835-89, 20836-89
United States Tax Court
T.C. Memo 1992-263; 1992 Tax Ct. Memo LEXIS 285; 63 T.C.M. (CCH) 2936; May 7, 1992, Filed *285 Decisions will be entered under Rule 155. Benjamin Lewis, for petitioners. Peggy Gartenbaum and Rosemarie Dever Camacho, for respondent. CLAPP
CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: In these consolidated cases, the issues and parties are closely related. The treatment of issues pertaining to Kahrahb Restaurant, Inc. (the corporation), will directly affect the outcome of the case involving Massud and Soudaeh Rahbar (petitioners) and vice versa. Respondent determined the following deficiencies in and additions to petitioners' and the corporation's Federal income taxes as follows: Kahrahb Restaurant, Inc. -- Docket No. 20835-89
Addition to Tax
Year
Deficiency
Sec. 6653(b)
1978
$ 26,869
$ 13,435
1979
61,589
30,794
1980
7,381
3,691
Massud Rahbar and Soudaeh Rahbar -- Docket No. 20836-89
Addition to Tax
Year
Deficiency
Sec. 6653(b)
1978
$ 6,936
$ 3,468
1979
29,062
14,531
1980
26,301
13,151
All section references are to the Internal Revenue Code for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. The issues for decision are: (1) Whether petitioners' excess *286 expenditures in the amounts of $ 33,257, $ 63,186, and $ 39,456 in 1978, 1979, and 1980, respectively, are unreported taxable income attributable to diverted receipts of the corporation; (2) whether gross receipts of the corporation should be increased by $ 45,000 and $ 85,000 in 1978 and 1979, respectively, because these amounts did not represent loans to the corporation from petitioners; (3) whether petitioners received constructive dividends from the corporation in the amounts of $ 4,187, $ 14,218, and $ 13,750 in 1978, 1979, and 1980, respectively, by having the corporation pay their personal expenses directly; (4) whether petitioners are liable for additions to tax for fraud under section 6653(b); (5) whether Soudaeh Rahbar (Soudaeh) is entitled to relief from liability pursuant to the innocent spouse provisions of section 6013(e); and (6) whether respondent is barred by the statute of limitations from assessing deficiencies against petitioners and the corporation for 1978. Petitioners conceded the following adjustments determined in the notice of deficiency: (1) Diverted corporate receipts in the amounts of $ 12,000 and $ 6,500 in 1979 and 1980, respectively; (2) interest income *287 in the amount of $ 2,379 in 1979; and (3) the recapture of a rental loss in the amount of $ 2,255 in 1980. The corporation conceded the following adjustments determined in the notice of deficiency: (1) Additional receipts in the amount of $ 6,500 in 1980; and (2) adjustments to deductions in the amounts of $ 12,000 and $ 6,697 in 1979 and 1980, respectively. Massud Rahbar (Massud) and the corporation conceded the additions to tax for fraud for 1979 and 1980. FINDINGS OF FACT We incorporate by reference the stipulation of facts and attached exhibits. Petitioners resided in Glen Cove, New York, when they filed their petition. When the petition for the corporation was filed in this case, it was located in Jamaica, New York. Massud was born in Tehran, Iran, and he completed his high school education in Iran. He came to the United States in 1964 on a student visa. While in the United States, he earned degrees in engineering and in hotel and restaurant management. Massud met his wife, Soudaeh, in 1973 while on one of his trips to Iran. In that same year, they were married, and she came to the United States for the first time. The corporation was formed in 1977 with an initial *288 investment of $ 7,500. The corporation operated a restaurant and supper club and was located in a motel near Kennedy Airport. It consisted of a bar area, dining and banquet rooms, coffee shop, and kitchen. The premises on which the corporation was located has operated as a restaurant since 1963. Massud is a 100-percent shareholder of the corporation. Prior to forming the corporation, Massud worked as a maitre d' and as a bartender. The $ 7,500 that Massud invested in the corporation came from his savings, a loan repayment, and payment of an insurance claim to his wife. Massud obtained a liquor and a cabaret license in 1977. He substantially renovated the premises before beginning operation, and he continued to renovate the premises throughout the years in issue. Massud advertised the corporation and offered special rates to airline personnel to increase business. The corporation's business improved as a result of his efforts. The majority of the corporation's patrons were airline passengers who had missed connecting flights or whose flights had been delayed, airline personnel, motel guests, and members of the Iranian community. If, under certain circumstances, a traveler *289 missed a flight, the airline would provide him with vouchers that entitled him to lodging at the motel and meals at the corporation's restaurant. Every month, the corporation would receive a check from the motel's management for the amount that it was owed by the airlines under this voucher system. Massud spent a great deal of time working for the corporation, and he often stayed overnight. In order to spend time with her husband, Soudaeh went to the corporation most days during the years in issue. In 1980, she worked for the corporation assisting the bookkeeper approximately 2 days a week. The accountant for the corporation during the years in issue was Ronald McNavich (McNavich). He prepared the corporation's returns and petitioners' personal Federal income tax returns for the years in issue. McNavich, with the assistance of the corporation's bookkeeper, set up the books and records. The corporation reported on its Forms 1120 gross receipts in the amounts of $ 347,273, $ 542,275, and $ 662,523 in 1978, 1979, and 1980, respectively. McNavich determined that the corporation owed approximately $ 10,000 in taxes for the 1978 tax year. Upon being informed of the 1978 tax liability, *290 Massud told McNavich that he had loaned the corporation $ 45,000 during the year. Massud did not provide McNavich with any substantiation of this loan, and there were no entries in the corporation's books and records of a loan from Massud. Accordingly, McNavich made a journal entry decreasing the amount of the corporation's sales by $ 45,000 and increasing the loans from shareholders account by this same amount. This resulted in a zero tax liability for the corporation in 1978. McNavich subsequently decreased the loans from shareholders account by the amount of petitioners' personal expenses that were paid for by the corporation in 1978. This reduction in loans from shareholders account, or loan repayment by the corporation, meant that petitioners did not recognize taxable income in 1978 in the amount of their personal expenses paid for by the corporation. McNavich determined that the corporation owed approximately $ 30,000 in taxes for 1979. Upon being informed of the 1979 tax liability, Massud informed McNavich that he had loaned the corporation $ 85,000 during the year. Massud did not provide McNavich with any substantiation of this loan, and there were no entries in the *291 the corporation's books and records of any loans from Massud in 1979. Again, McNavich decreased the amount of the corporation's sales by $ 85,000 and increased the loans from shareholders account by the same amount. This resulted in a nominal tax liability for the corporation for 1979. McNavich subsequently decreased the loans from shareholders account by the amount of petitioners' personal expenses that had been paid by the corporation during 1979. Petitioners did not recognize taxable income in 1979 in the amount of their personal expenses paid by the corporation because this amount was treated instead as a reduction in the corporation's loans from shareholders account. In 1980, McNavich calculated that the corporation owed no Federal income tax. In 1980, the corporation obtained a bank loan in the amount of $ 24,000. This amount was entered in the corporation's cash receipts journal and general ledger. Respondent, using the source and application of funds analysis, determined that petitioners' expenses exceeded their known available sources of funds during the years 1974 through 1980. In so determining, respondent credited petitioners' source of funds with $ 8,560, which *292 Massud reported to the United States Customs Service on his return trip from Iran in 1975, $ 14,000 which was located in an Iranian bank in 1977, and $ 6,013.78 received from Iran in 1980. For the years in issue, 1978, 1979, and 1980, respondent determined that petitioners' total expenditures exceeded their known available sources of funds by $ 33,256.64, $ 65,737.16, and $ 75,941.25, respectively. In 1985, Massud was indicted for criminal tax evasion under section 7201 by a Federal grand jury sitting in the United States District Court for the Eastern District of New York. The indictment contained three counts of tax evasion with respect to his individual income taxes for 1978, 1979, and 1980, and three counts of tax evasion with respect to the corporation's income taxes for these same years. Massud was convicted of income tax evasion with respect to both individual and corporate taxes due for 1979 and 1980. He was acquitted, both individually and with respect to the corporation, for 1978. OPINION 1. Excess Expenditures
Respondent may use indirect methods to determine whether a taxpayer has failed to report amounts of income and to determine the correct amount of income. *293 Holland v. United States, 348 U.S. 121 (1954). Respondent's use of the source and application of funds method of reconstructing income (also known as the cash expenditures method) is based on the assumption that the amount by which the taxpayer's application of funds exceeds his known sources of income is taxable income, absent some showing by the taxpayer of a nontaxable source. Taglianetti v. United States, 398 F.2d 558 (1st Cir. 1968), affd. per curiam 394 U.S. 316 (1969). "As explanation, the taxpayer may show that the excess is attributable to nontaxable items such as loans, gifts, inheritances, or other assets on hand at the beginning of the taxable period." Peters v. Commissioner, T.C. Memo. 1981-83. Respondent's determination under this method is presumptively correct. Rule 142(a). When, in such a case, the taxpayer has the burden of proof, respondent need not prove a likely source of the unreported income. Respondent determined that petitioners have taxable income to the extent that application of their funds exceeds their known sources of income for the years in issue, and that these "excess *294 expenditures" were made with unreported income taken from the operation of the corporation. Petitioners do not dispute that they spent amounts in excess of their reported income during the years in issue. They do not challenge respondent's use of the source and application of funds method to determine their income, and they have stipulated to the expenses calculated by respondent for the years in issue. However, petitioners claim that they had a great deal of wealth in Iran and that, both before and during the years in issue, various friends and family members brought sums of money to them from Iran. It was this nontaxable money that was used for their "excess expenditures". Massud testified that while living in Iran he owned a fleet of taxicabs. Before arriving in the United States in 1964, he sold this fleet for approximately $ 45,000. He left these proceeds with his aunt and uncle in Iran who invested them in real estate. He produced a power of attorney dated May 9, 1973, that gave his aunt authority to "conduct any kind of transaction" on his behalf. Massud testified that in 1977 he had over $ 200,000 and "a couple of pieces of land" in Iran. From time to time, relatives *295 or friends from Iran would wire him funds or bring him money on their visits to the United States. During the years in issue, there was a restriction as to the amount of money that one could bring out of Iran, and Massud's friends and family often had to exchange currency on the black market and smuggle it to the United States. Soudaeh testified that her family in Iran was very wealthy. When she first came to the United States she brought with her a large sum of money. In 1976 and 1977, her relatives visited her in New York and brought with them money and a check. Massud's uncle, an Iranian Air Force officer, testified that, from 1974 through 1976, he was stationed in the United States to purchase spare parts for the Iranian Air Force. He stated that on many occasions he delivered gifts to Massud from Iran. On one occasion, he was present when Massud opened the crate in which one of these gifts was packaged, and he saw a "large" amount of American currency. He testified also that money for Massud was transferred by check or wire from Iran in the names of his children, and that he would endorse the checks over to Massud. There are several factors which weaken petitioners' *296 transferred wealth argument. Petitioners did not produce any documentary evidence to corroborate their testimony. We have no evidence of Massud's taxicab business in Iran; no evidence of real estate sales in Iran or deposits of money into bank accounts in Iran; no evidence showing the dates that family and friends arrived in the United States with gifts or money; and no evidence such as cancelled checks or receipts of wire transfers showing specific amounts of money delivered to petitioners. Without some such supporting evidence, petitioners' testimony is unconvincing, and we are unpersuaded that they used money from Iran for their excess expenditures. Next, on several occasions, petitioners borrowed money to finance car purchases. In 1977, petitioners applied for loans in the amounts of $ 3,000 and $ 4,500. In 1980, petitioners applied for loans in the amounts of $ 10,000 and $ 7,000. It is difficult to believe that petitioners would borrow these relatively small sums of money and incur interest expense, if at the same time they were receiving large sums of money from Iran. Petitioners offered no explanations of why they chose to borrow rather than spend their money from Iran. *297 The evidence of borrowing money indicates an absence, rather than the presence, of a large accumulation of cash. Thomas v. Commissioner, 223 F.2d 83, 88 (6th Cir. 1955), revg. on other grounds and remanding a Memorandum Opinion of this Court dated October 30, 1953. Finally, we agree that the excess application of funds determined by respondent in her reconstruction was attributable to diverted receipts from the corporation. Massud was the sole shareholder of the corporation, and he exercised exclusive control over the corporation. The corporation generated a sufficient amount of cash to account for the amounts of unreported income that respondent determined. The corporate returns for the years in issue reflect gross profits of $ 178,286, $ 208,987, and $ 200,069, respectively. While we realize that the corporation had substantial operating expenses, these large gross profits presented petitioners with opportunities to use corporate funds for their own purposes. The fact that petitioners have admitted to diverting corporate receipts in 1979 and 1980 reveals their propensity to extract unreported funds from the corporation. Peters v. Commissioner, T.C. Memo. 1981-83.
*298 2. Loans to the Corporation
Respondent determined that "loans" made by Massud to the corporation in 1978 and 1979 in the amounts of $ 45,000 and $ 85,000, respectively, were fictitious, and that these amounts instead represent corporate receipts. Petitioners contend that the loans were bona fide loans made from their accumulated wealth in Iran. Further, they argue that the actual cash sales generated by the corporation were not sufficient to cover the cash payouts made, and therefore Massud was required to loan the corporation these sums of money. For several reasons, we sustain respondent's determination on the issue of loans to the corporation. Because we find that petitioners did not receive large sums of money from Iran during the years in issue, we are not persuaded that Massud had available funds to loan the corporation in 1978 and 1979. Also, petitioners have presented no evidence of these loans. The corporation's cash receipts journal showed a loan to the corporation from Massud in 1977 of $ 9,500 and a bank loan in 1980 of $ 23,402. Yet, corporate books and records reveal no loans from Massud in 1978 and 1979, and Massud did not provide McNavich with any substantiation *299 of such loans. Massud's timing in advising McNavich of the loans also is suspect. For both the 1978 and 1979 years, when McNavich told Massud that there would be tax liabilities, Massud suddenly remembered loans to the corporation which, when substituted for gross receipts, would bring taxable income down to about zero. In each case, these bookkeeping adjustments were the first trace on the corporate records of the alleged loans. For 1980, McNavich calculated no corporate tax, and Massud remembered no loans. The timing of the loans appears to be more than mere coincidence. Finally, petitioners' argument, that the cash sales of the corporation were insufficient to meet the cash payments actually made, is flawed. Such argument assumes that the $ 45,000 and $ 85,000 at issue were actually loans by Massud and not cash gross receipts to the corporation. If, as respondent argues, the $ 45,000 and $ 85,000 were cash gross receipts, then the corporation's cash sales would have been sufficient to meet its cash payouts. In any event, this is precisely the issue that we are here to resolve, and therefore it necessarily stands that we cannot accept petitioners' assumption. Moreover, *300 even if the corporation had only a small percentage of cash sales, this does not lead to the inescapable conclusion that petitioners supplied the corporation with an infusion of cash so that it could meet its cash payment requirements. 3. Constructive Dividends to Petitioners
Respondent determined that petitioners received constructive dividends from the corporation for each of the years in issue to the extent that the corporation made payments on petitioners' behalf. Petitioners do not dispute that the corporation paid some of their personal expenses; however, they contend that these payments do not represent dividends but, instead, repayment of the loans that they had made to the corporation. Accordingly, they argue that these payments should not be treated as taxable dividends to them but should be chargeable against the corporation's loans from shareholders account. Because we find that petitioners did not make loans to the corporation, we find that the corporation's payments of petitioners' personal expenses represent constructive dividends, not loan repayments, as determined by respondent. 4. Innocent Spouse
Soudaeh contends that she is entitled to relief *301 from liability for all of the years in issue under the innocent spouse provisions of section 6013(e). She must satisfy several conditions to be relieved from liability under section 6013(e). However, respondent concedes all but the following two conditions, which petitioner must prove to be relieved from liability: (1) In signing the return, she did not know, and had no reason to know, that there was a substantial understatement of tax; and (2) taking into account all the facts and circumstances, it would be inequitable to hold her liable for the deficiency attributable to the understatement. Sec. 6013(e)(1)(C) and (D). After concessions by petitioners, the adjustments giving rise to the substantial understatements are for constructive dividends and excess expenditures, both items of omitted income. "In order to satisfy her burden of proof with regard to whether she had reason to know of the omitted income, petitioner must establish that a reasonably prudent taxpayer, with her knowledge of the family finances, would have no reason to know of the omission." Estate of Jackson v. Commissioner, 72 T.C. 356, 361 (1979). Soudaeh first came to the United States *302 in 1973; she had not received any formal training in the English language; she had no knowledge of business, financial, or tax matters; and she relied completely on her husband to handle family finances. Soudaeh worked for the corporation twice a week during 1980. However, she testified that her duties were limited to whatever the bookkeeper requested of her, and that generally she answered the telephone or signed for deliveries. We believe that when Soudaeh signed the income tax returns for the years in issue, she neither knew nor had reason to know of the omitted income. In deciding whether it is inequitable to hold Soudaeh liable for the deficiencies, we must take into account whether she significantly benefitted, directly or indirectly, from the omitted income at issue. Purcell v. Commissioner, 86 T.C. 228 (1986), affd. on other issues 826 F.2d 470 (6th Cir. 1987). A determination under this provision is subjective and essentially factual. Allen v. Commissioner, 61 T.C. 125, 130 (1973), affd. in part, revd. in part on other grounds and remanded 514 F.2d 908 (5th Cir. 1975). "However, normal support *303 is not a significant 'benefit' for purposes of this determination." Sec. 1.6013-5(b), Income Tax Regs. During the years in issue, petitioners leased a luxury apartment and purchased a new home and two new luxury automobiles. Such acquisitions constitute more than normal support. Petitioners have not presented any evidence to show that these items did not in some way benefit Soudaeh. Based on the entire record, we conclude that Soudaeh derived substantial benefits as a result of the omitted income. Because she has failed to satisfy this prong of the test, she does not qualify for relief from personal liability under section 6013(e). Adams v. Commissioner, 60 T.C. 300 (1973). 5. Fraud
We must now consider whether part of the underpayments of taxes required to be shown on Massud's and the corporation's Federal income tax returns for 1978 were due to fraud. Section 6653(b) imposes an addition to tax if any part of an underpayment of tax is due to fraud. Respondent must establish by clear and convincing evidence that petitioners and the corporation intended to evade taxes which they knew to be owing by conduct intended to conceal, mislead, or otherwise *304 prevent collection of such taxes. Rowlee v Commissioner, 80 T.C. 1111, 1123 (1983). A taxpayer criminally convicted under section 7201 is collaterally estopped from denying fraud for purposes of section 6653(b) in a civil tax case involving the same years. Amos v. Commissioner, 43 T.C. 50 (1964), affd. 360 F.2d 358 (4th Cir. 1965). Massud was convicted of criminal tax evasion pursuant to section 7201 for himself and the corporation for 1979 and 1980. He was acquitted, both individually and with respect to the corporation, for 1978. Thus, Massud and the corporation have conceded the fraud issue for the 1979 and 1980 tax years. The year 1978 remains before us. Fraud is evidenced by a taxpayer's extensive dealings in cash, failure to keep adequate books and records, and failure to supply complete information about his income and expenses to his tax return preparer. Harper v. Commissioner, 54 T.C. 1121, 1141 (1970). The understatement of petitioners' income was attributable to Massud's diversion of cash from the corporation. He did not report the alleged loan in the corporation's books and records, *305 nor did he provide the accountant with any substantiation of the alleged loan. The creation of a loan from shareholders account obfuscated the recordkeeping system and involved the deliberate falsification of records. In sum, we conclude that respondent has shown by clear and convincing evidence that all or part of petitioners' underpayment of tax for 1978 was due to fraud on the part of Massud. We further conclude that the fraud of Massud is attributable to the corporation. A corporation can act only through individuals who are its officers or employees. We are entitled to impute to the corporation the actions and motives of Massud when he was acting on behalf of the corporation. Laputka v. Commissioner, T.C. Memo. 1981-730. Therefore, the corporation is liable for the addition to tax for fraud for 1978. Section 6653(b) requires that the addition to tax for fraud must be proved with respect to each spouse separately. Respondent has not met her burden of proving that some part of the underpayments for all of the years in issue were due to fraud on the part of Soudaeh. Respondent's argument that Soudaeh participated in falsifying the corporation's books *306 and records has not been proved. We have no evidence that Soudaeh was substantially involved in the corporation's affairs. Accordingly, we find that for all of the years in issue, Soudaeh is not liable for fraud. 6. Statute of Limitations
Section 6501(c)(1) provides that "In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed * * * at any time." Accordingly, assessments for the year 1978 for petitioners and the corporation are not barred by the statute of limitations. Although respondent has proved fraud only as to Massud, that is sufficient to toll the statute of limitations against both Massud and Soudaeh. Stone v. Commissioner, 56 T.C. 213, 228 (1971). Decisions will be entered under Rule 155.