T.C. Memo. 1997-471


UNITED STATES TAX COURT


JOHN R. BOONE, JR., Petitioner, <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 13909-96.                    Filed October 15, 1997.


        On the facts, <u>Held</u>:  R has proven, by a
preponderance of the evidence, that P improperly
omitted a substantial amount of gross income from his
Federal tax returns for 1989 and 1990 within the
meaning of sec. 6501(e)(1)(A), I.R.C., such that R is
not barred from assessing deficiencies for those years
by the 3-year statute of limitations of sec. 6501(a),
I.R.C.  <u>Held</u>, <u>further</u>, P is not liable for self-
employment taxes pursuant to sec. 1401, I.R.C., on
gross income omitted from his returns for 1989 and
1990.  <u>Held</u>, <u>further</u>, accuracy-related penalties for
negligence pursuant to sec. 6662(a), I.R.C., for 1989
and 1990 are sustained.


<u>David W. Gray</u>, for petitioner.

<u>Aubrey C. Brown</u>, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

NIMS, <u>Judge</u>:  Respondent determined the following deficiencies and accuracy-related penalties with respect to the Federal income tax of petitioner, John R. Boone, Jr., for the taxable years 1989 and 1990:

| Year | Deficiency | Penalties<br>Sec. 6662(a) |
|------|-----------|---------------------------|
| 1989 | $11,775 | $2,415 |
| 1990 | 32,389 | 6,478 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions by petitioner, the issues remaining for decision are:  (1) Whether respondent is barred by the expiration of the 3-year period of limitations of section 6501(a) from assessing and collecting deficiencies in petitioner's Federal income tax for 1989 and 1990; and, if respondent is not so barred; (2) whether petitioner understated his income tax in the amounts determined by respondent in the notice of deficiency for the years in issue; and (3) whether unreported bank deposits and cash expenditures made by petitioner in 1989 and 1990 constitute self-employment income subject to tax under section 1401 for those years; and (4) whether petitioner is liable for accuracy-related penalties for negligence pursuant to section 6662(a) for 1989 and 1990.

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. At the time petitioner filed his petition he resided in Louisville, Kentucky.

FINDINGS OF FACT

A. Petitioner's Upbringing and Relationship With His Great-Grandfather

Eugene Oscar Walker (Walker) was petitioner's great-grandfather. Walker married Julia, and they were the parents of Jean Walker Boone (Jean), petitioner's grandmother. After Julia died, Walker married Julia's sister, Susanna.

Jean was married to J. L. Boone, petitioner's grandfather. They were the parents of John R. Boone, Sr., petitioner's father, and two other children. John R. Boone, Sr., married Marilyn, and they had four children. Petitioner was born on February 22, 1964; he is the second child and eldest son of John R. and Marilyn Boone.

During his childhood, petitioner lived with his parents and siblings in a house located on property adjacent to Walker's farm. Petitioner shared a bedroom and closet with his two younger brothers. Petitioner's parents opened a savings account for him when he was very young.

The Walker farm raised dairy and beef cows, and grew tobacco, hay, and corn. Walker worked on his farm almost daily. Petitioner would frequently "tag along" with his great-

grandfather and assist him in any way that he could. Petitioner helped milk the cows in the mornings and evenings, and he brought the cows back and forth to market.

When his health began to fail, Walker moved from his house in town several miles away from his farm to live with petitioner's family; he remained there for approximately 6 months. (Susanna was herself too frail to care for her husband.) During that time, petitioner helped his great-grandfather with such mundane activities as eating, bathing, dressing, and getting out of bed. Petitioner also assisted his great-grandfather with his medications and applied ointments to his aching joints. Although petitioner was not the only one who aided Walker during this period, he provided the majority of caretaking when he was not in school or working on the farm. Marilyn did all of the cooking and some of the laundering for Walker.

Walker's health deteriorated to the point that he was admitted to a nursing home on February 5, 1976. He was transferred to Spring View Hospital on March 28, 1976, where he died on April 17, 1976, at the age of 83.

B.  Walker's Estate

Walker died testate. He left one-half of his personal property to Susanna and the other one-half to Jean. He also left an undivided one-half interest in his real property to Susanna for her life, with remainder to Jean, and the other one-half interest to Jean in fee simple absolute. Jean was the executrix

of his will.  Walker's total gross estate consisted of the following assets:

| | |
|---|---|
| A. Real estate | $222,000.00 |
| B. Stocks and bonds | 5,320.59 |
| C. Mortgages, notes and cash | 255.00 |
| D. Life insurance | 6,000.00 |
| E. Jointly-owned property | 92.76 |
| F. Other misc. property | 22,500.00 |
| Total gross estate | 256,168.35 |

The deductions for Walker's estate were as follows:

| | |
|---|---|
| J. Funeral expenses and other expenses | $4,626.98 |
| K. Debts of decedent | 20,516.16 |
| L. Mortgages and liens | 162,815.81 |
| Total | 187,958.95 |
| Adjusted gross estate | 68,209.40 |

The estate tax return showed that, at the time of his death, Walker had no cash on hand or on deposit in any bank.  While Walker had a safe deposit box, it contained no money.  No transfers of property within 3 years of Walker's death were reported on Schedule G, Transfers During Decedent's Life, attached to the Form 706, United States Estate Tax Return, filed by Jean, nor was any gift tax return filed by or for Walker.  The Walker estate tax return was accepted as filed by the IRS by letter dated January 13, 1978.

C.  Petitioner's Education, Employment, and Living Arrangements

After graduating from high school in 1982, petitioner attended St. Catherine's Community College (St. Catherine's) in

Springfield, Kentucky, for 1 year, to which he commuted from his parents' home.  Petitioner subsequently transferred to Eastern Kentucky University (Eastern) in Richmond, Kentucky.  While attending Eastern, he lived in a dormitory with two roommates. Petitioner's college education was financed at least in part through student loans, which he repaid following college.

After earning an associate's degree from Eastern in 1985, petitioner moved to Campbellsville, Kentucky, where he lived by himself in an apartment on Maple Street for approximately 6 months.  He then moved to a house located at 103 Columbia Court, in Campbellsville, which he shared with Perri Warren and Robin Taylor.  Petitioner had previously become acquainted with Ms. Warren at the Campbellsville-Taylor County Rescue Squad (the Rescue Squad), an emergency medical service based in Campbellsville, where he was employed as a paramedic and she was a paramedic student.

Petitioner and Ms. Warren developed a close platonic friendship during 1986 through 1990.  In addition to living and working together, they exchanged birthday and Christmas gifts and occasionally vacationed together.  In July 1987, petitioner, Ms. Warren, and Ms. Taylor moved to a house at 113 Howell Street, in Campbellsville.

In July 1989, petitioner moved to a house on Mayfield Drive in Campbellsville, where he lived alone.  His fiancee, Sandra Davis (Sandra), helped him move to this address.  On September

28, 1989, petitioner contracted to buy a house and 9.3 acres of land on Cave Road, in Campbellsville, for $53,500. He made a cash deposit of $500 upon execution of the contract. After negotiation and applications, he received, on October 18, 1989, a commitment from First Federal Savings Bank to grant a HUD-insured residential mortgage. The closing took place on November 6, 1989. In connection with petitioner's purchase of the house, Jean gave him $5,000. No other sizable cash assets belonging to petitioner were listed on any of the documents relating to his acquisition of the house.

Petitioner and Sandra were married on June 1, 1990, and honeymooned in Tahiti.

### D. Petitioner's Cash Expenditures in 1989 and 1990

On February 1, 1989, petitioner purchased a 1989 Ford Mustang convertible for approximately $20,500, less a deposit of $500 and trade-in allowance, with the balance of approximately $17,100 financed by Liberty National Bank over 6 years at a 14.95-percent annual rate. In October 1989, petitioner paid in full, with cash, the outstanding loan of $16,132 on the Mustang.

Petitioner and Sandra purchased a 1989 Chevrolet Corvette in October 1990. The purchase price of the Corvette was $27,995. Petitioner made a deposit of $200 on October 3, 1990. On October 5, 1990, petitioner paid the balance due for the Corvette and a service contract, after receiving a trade-in allowance, with cash in the amount of $18,003, which he had carried to the dealership

in a brown paper bag.  The cash belonged to petitioner, not Sandra.  There were mostly hundreds and fifties in the bag, although there may also have been some other denominations.

During 1990, petitioner made additional cash expenditures: he furnished his newly acquired home, bought a John Deere mower, and purchased a satellite dish, stereo equipment, and jewelry, among other items.

When petitioner went out of town, he frequently brought traveler's checks with him in case his wallet got lost or stolen. Petitioner purchased $4,500 worth of traveler's checks in 1989. Petitioner purchased $3,700 worth of traveler's checks for his Tahitian honeymoon in 1990.

During 1989 and 1990, much of the cash expended and deposited by petitioner had a musty and mildewed smell.

E.  Petitioner's Estrangement From His Family

Since at least the time he attended Eastern, petitioner has had an estranged relationship with his family.  His father had a predilection for alcohol, and although petitioner could point to no reason in particular, petitioner did not get along well with his mother.  Once he left home for college, petitioner only infrequently returned to his parents' house.  He did not often talk with his mother on the telephone.  Petitioner had no interaction at all with his father.

John R. Boone, Sr., who also used the alias "Charles Grass", was "notorious" in the community for being in the marijuana

business. On September 22, 1982, upon a guilty plea, petitioner's father was convicted by the U.S. District Court for the Western District of Kentucky on charges of conspiring to unlawfully import marijuana into the United States and on other drug charges; he received a 5-year prison sentence. On April 29, 1988, upon a guilty plea to charges of aiding others knowingly and intentionally in unlawfully manufacturing a mixture or substance containing marijuana, he was convicted and sentenced to prison by the U.S. District Court for the District of Minnesota for a term of 20 years, to be followed by 5 years of supervised release.

F. Petitioner's Employment and Business Activities in 1989 and 1990

Throughout all of 1989 and 1990, petitioner was employed as a paramedic by the Rescue Squad. Petitioner also began a dog kennel business, known as Dry Creek Kennel, in 1990. Petitioner constructed a garage and facilities for the kennel. He spent $12,508 in cash for the construction. The kennel was not successful. Petitioner did not engage in any other trade or business activity in 1989 and 1990, nor did he win any money gambling or in the lottery.

G. Petitioner's Tax Returns for 1989 and 1990

Petitioner is a calendar year, cash basis taxpayer. On his 1989 Form 1040EZ, Income Tax Return for Single Filers With No Dependents, petitioner reported wages from the Rescue Squad in

the amount of $16,028.03, and interest income of $70.83, for total adjusted gross income of $16,098.06.

Petitioner and Sandra initially filed a joint Form 1040, U.S. Individual Income Tax Return, for 1990. The gross income reported on the 1990 return as originally filed was $19,607. This return failed to report losses from petitioner's dog kennel on a Schedule C, Profit or Loss From Business (Sole Proprietorship).

After filing the return, petitioner prepared a Form 1040X, Amended U.S. Individual Income Tax Return, for 1990. Petitioner changed his filing status to "married filing separate return". Attached to the return was a Schedule C reporting gross receipts or sales of the dog kennel business in the amount of $806, and total expenses of $10,291, for a net loss of $9,685 for the kennel. The gross income included on petitioner's 1990 amended return, including gross receipts from his dog kennel business and excluding Sandra's separate income, was $19,609.

H. Petitioner's Interviews With Respondent's Agent

Sometime in 1992, Revenue Agent Rhonda Hensley (Hensley) contacted petitioner as part of a compliance check initiated as the result of a cash transaction report filed with the IRS by the car dealership. Hensley examined petitioner's tax returns for 1989 and 1990 at petitioner's home in August 1992. During the interview, petitioner told Hensley that he had acquired the money to purchase the Corvette through his efforts to save at least 10

percent of his earnings from the time he was 15 years old. Petitioner also told Hensley that he worked odd jobs, that he had some savings from tobacco sales from his family's farm, and that he and his wife had received a $5,000 wedding gift from Sandra's grandfather.

Upon reviewing petitioner's bank records during the course of the interview, Hensley discovered that, in addition to purchasing the Corvette for cash, petitioner had made at least $50,000 in cash deposits into a bank account in 1989 and 1990. Petitioner and Hensley spent the rest of the day going over his records and discussing where he obtained the money to make such deposits. After Hensley perceived some inconsistencies between the records and what petitioner had told her, and because she was having trouble understanding petitioner, she asked petitioner to provide her with a written statement explaining the discrepancies, to which he assented. Petitioner prepared the written statement after he and Hensley had discussed the fact that gifts of up to $10,000 per donee were tax-free to the donor. The written statement was not made under oath, and petitioner's signature does not appear on it. The written statement provided as follows:

> Cash gifts:
> Parents  Grandparent
> starting at approximately age 15 basically yearly in
> area of [$]5,000-10,000 (an estimate) yearly sometimes
> it varied from year to year--not in lump sum but over
> period of time.  Could be for example:  allowances,
> given on holidays and birthdays etc.  * * *

> Additional monies were obtained when we were children from sale of livestock, father had farm and would give us cows, etc. and when sold at stockyards we [received] proceeds, same way with other farm items, tobacco crop, hay, corn, etc.  Unknown as to the amounts from above, but do remember numerous [occasions] when this was done, I am thinking that this was a major portion of the money.

Petitioner also wrote that relatives had given Sandra and him cash gifts for their wedding, although he did not specify the amounts or donors, except for the $5,000 given to the couple by Sandra's grandfather.  In addition, petitioner wrote that his relatives had given him gifts for birthdays, Christmas, and other occasions, although he was unable to recall dates and amounts.

After the written statement was prepared, Hensley requested that petitioner provide her with Marilyn's telephone number and address in order for Hensley to verify that his parents had given him cash as he claimed.  She then tried to call his mother, but no one answered the telephone.  Shortly thereafter, Sandra returned home.  She suggested that petitioner seek professional advice and asked Hensley to leave.

Hensley met again with petitioner in September 1992, in the office of his attorney, David W. Gray (Gray).  At that time, petitioner told her that the information he had previously given her in the written statement was incorrect.  Petitioner said that he had actually been given a large amount of cash in a canister by his great-grandfather when petitioner was 15 years old.  Petitioner said that the money contained in the canister

consisted mainly of tens and twenties. Petitioner explained to Hensley that he had not revealed the alleged gift earlier because his father and one of his brothers were involved in the illegal narcotics business, that they had wanted him to participate in the illicit activity, and that he had declined to do so. In that connection, petitioner told Hensley that he had concerns about what his father and brother might do to him if they were to discover that he had received such a large cash gift from their mutual ancestor.

Following the second interview, Gray gave Hensley some of petitioner's bank records, and Hensley issued an information document request listing other specific items she wished to examine, such as documents related to the purchase of the house at Cave Road, the Corvette, and the payoff of the Mustang loan.

A third meeting between Hensley and petitioner took place in March 1993. At this time, Hensley primarily wanted to ascertain all possible sources of petitioner's bank deposits and cash expenditures. She also wanted to learn about the size of the canister holding the alleged cash gift, anything unusual about the money contained therein, and how the cash was placed in the can. Petitioner told her that his great-grandfather had given him the key to a file cabinet containing the canister and that the cabinet was locked. Petitioner also said that the money was "crunched down" inside the container. Hensley asked petitioner

if the money were bound together by rubber bands, but he did not respond.

Prior to the March 1993 meeting with petitioner, Hensley had concluded that there were indicia of fraud in petitioner's case. Afterwards, she referred the case to the Criminal Investigation Division (CID) of the IRS. The investigation resulted in no indictment of petitioner. No direct link between petitioner and the criminal activity of his father during 1989 and 1990 was uncovered by the agents assigned to the CID.

I.   The Notice of Deficiency

Respondent issued a statutory notice of deficiency on April 5, 1996, for the taxable years 1989 and 1990. Among other things, respondent made adjustments to petitioner's gross income of $32,697 in 1989 and $93,809 in 1990, utilizing the bank deposits and cash expenditures method of income reconstruction. Respondent also disallowed certain Schedule C expenses for 1990 related to the dog kennel business in the amount of $2,418. Moreover, respondent determined that petitioner was liable for self-employment taxes pursuant to section 1401 on the entire amount of the understatements of gross income for 1989 and 1990. In addition, respondent determined that petitioner was liable for accuracy-related penalties for 1989 and 1990 for negligence pursuant to section 6662(a).

In the pleadings, petitioner conceded that he improperly omitted $3.43 of taxable interest income from the Life and

Casualty Insurance Co. of Nashville, Tennessee, on his return for 1989. Petitioner subsequently conceded respondent's adjustment disallowing claimed 1990 Schedule C expenses of $2,418. In addition, the parties have stipulated that petitioner's bank deposits (less deposited checks returned for insufficient funds and bank errors) and cash expenditures from funds not derived from the bank account, less nontaxable sources of funds other than petitioner's alleged cash hoard at the beginning of 1989, were as follows for each of the years in issue:

### 1989 Agreed Bank Deposits Plus Cash Expenditures

| | |
|---|---|
| BANK DEPOSITS | $29,571.88 |
| Less: | |
| Checks returned insufficient funds plus | |
| bank error | (882.99) |
| | |
| FUNDS NOT DEPOSITED IN BANK | |
| CASH EXPENDITURES | |
| Car repairs | 48.99 |
| Traveler's checks | 4,500.00 |
| IRA | 2,000.00 |
| Form 4789 (pay off Mustang) | 16,132.00 |
| Deposit on house | 500.00 |
| Deposit on car (Mustang) | 500.00 |
| Stereo equipment | 403.50 |
| Jewelry | 100.00 |
| Concert tickets | 250.00 |
| TOTAL CASH EXPENDITURES | 24,434.49 |
| less: | |
| | |
| NONTAXABLE SOURCES OF FUNDS: | |
| Federal tax refund | 566.00 |
| Allstate refund | 324.58 |
| Gift from Jean Boone | 5,000.00 |
| Checks to cash | 370.00 |
| TOTAL AGREED NONTAXABLE SOURCES | (6,260.58) |
| | |
| TOTAL AGREED BANK DEPOSITS, CASH EXPENDITURES, LESS NONTAXABLE SOURCES OF FUNDS | 46,862.80 |

### 1990 Agreed Bank Deposits Plus Cash Expenditures

| | |
|---|---:|
| BANK DEPOSITS | $59,083.67 |
| less: | |
| Checks returned insufficient funds | (1,773.41) |
| | |
| FUNDS NOT DEPOSITED IN BANK | |
| CASH EXPENDITURES | |
| Savings account deposit | 3,050.00 |
| Cash for honeymoon | 1,300.00 |
| Car repairs | 284.07 |
| Traveler's checks | 3,700.00 |
| Corvette | 18,203.00 |
| Fantasy tour | 7,142.00 |
| Garage and kennel | 12,508.00 |
| Alex Montgomery | 800.00 |
| Satellite dish | 1,995.00 |
| Furniture--Garrett's | 2,680.40 |
| Furniture--Jones | 629.95 |
| John Deere mower | 2,292.15 |
| Stereo equipment | 796.75 |
| Jewelry | 640.00 |
| RECC--electricity | 79.32 |
| Schedule C expenses | 2,593.00 |
| TOTAL CASH EXPENDITURES | 58,693.64 |
| less: | |
| | |
| NONTAXABLE SOURCES OF FUNDS | |
| Federal income tax refund | 582.81 |
| Checks to cash | 555.00 |
| Fantasy tour refund | 1,708.20 |
| Transfer saving to checking | 2,600.00 |
| Christmas gift from wife's grandfather | 500.00 |
| Wedding gift from wife's grandfather | 5,000.00 |
| Other cash wedding gifts | 500.00 |
| TOTAL AGREED NONTAXABLE SOURCES | 11,446.01 |
| | |
| TOTAL AGREED BANK DEPOSITS, CASH EXPENDITURES, | |
| LESS NONTAXABLE SOURCES OF FUNDS | 104,557.89 |

Based on the above stipulation, the correct amounts of unreported bank deposits and cash expenditures for 1989 and 1990 are $30,763.94 ($46,862.80 less $16,098.86) and $84,948.89 ($104,557.89 less $19,609), respectively. The parties have

stipulated that, other than the nontaxable sources agreed to above and the contested cash gift, there are no other possible nontaxable sources for the amounts omitted from petitioner's returns for 1989 and 1990.

### OPINION

We must decide whether certain of petitioner's bank deposits and cash expenditures constitute unreported gross income in excess of 25 percent of the amount of gross income stated in petitioner's return, so that assessment and collection of income tax thereon is not barred by reason of the 6-year period of limitations provided by section 6501(e)(1)(A). If assessment and collection is not so barred, we must also decide whether the unreported bank deposits and cash expenditures made by petitioner constitute self-employment income subject to tax pursuant to section 1401 for 1989 and 1990. We must also decide whether petitioner is liable for accuracy-related penalties for negligence pursuant to section 6662(a) for those taxable years.

### I. Does the Period of Limitations Bar Respondent's Assessment of Deficiencies for 1989 and 1990?

Generally, no deficiency in income tax may be assessed or collected more than 3 years after the return is filed. Sec. 6501(a). In the instant case, there is no dispute that the deficiency notice was mailed to petitioner after the expiration of the 3-year period of limitations, but within the 6-year period of limitations.

For the 6-year period of limitations to apply in this case, respondent has the burden of proving by a preponderance of the evidence that petitioner omitted from gross income an amount properly includable therein which is in excess of 25 percent of the amount of gross income stated in his 1989 and 1990 returns. Sec. 6501(e)(1)(A); see Burbage v. Commissioner, 82 T.C. 546, 553 (1984), affd. 774 F.2d 644 (4th Cir. 1985); see also Grant v. Commissioner, T.C. Memo. 1994-161 ("The burden is on respondent to establish by a preponderance of the evidence that the 6-year statute applies.")

The parties are in agreement that the amounts here in dispute are in excess of 25 percent of the gross income shown on petitioner's returns in 1989 and 1990. The question remaining, therefore, is whether respondent has proven that such amounts were "properly includable" in petitioner's gross income for those years. Sec. 6501(e)(1)(A).

Section 61 defines gross income as "all income from whatever source derived". This definition includes all "accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955).

Proof of omitted income by direct means is extremely difficult and often impossible for respondent to accomplish. See United States v. Abodeely, 801 F.2d 1020, 1023 (8th Cir. 1986). Consequently, the Government has available to it a number of

tools to determine unreported income by indirect methods of proof.  Id.; United States v. Hiett, 581 F.2d 1199, 1200 (5th Cir. 1978).  Petitioner asserts that, where the taxpayer's records are adequate, respondent cannot rely on indirect methods to reconstruct income.  Leaving aside the question of whether petitioner's records were in fact adequate in the instant case, it is well settled that respondent's use of an indirect method of determining income is not confined to situations where the taxpayer has no books and records or where his books are inadequate.  See, e.g., Holland v. United States, 348 U.S. 121, 133 (1954); Davis v. Commissioner, 239 F.2d 187 (7th Cir. 1956), affg. T.C. Memo. 1955-87; Goichman v. Commissioner, T.C. Memo. 1987-489; Estate of Hanna v. Commissioner, T.C. Memo. 1976-32.

In the instant case, respondent relies upon the bank deposits and cash expenditures method to show an improper omission of income.  The propriety of the bank deposits and cash expenditures method of income reconstruction is well established. See, e.g., Caulfield v. Commissioner, 33 F.3d 991, 992 (8th Cir. 1994), affg. T.C. Memo. 1993-423; United States v. Abodeely, supra at 1023; Parks v. Commissioner, 94 T.C. 654, 658 (1990).

The bank deposits and cash expenditures method is an offshoot of the bank deposits method.  The bank deposits and cash expenditures method is used by respondent to prove the existence of omitted or unreported income in circumstances where cash is

both deposited into bank accounts and spent by the taxpayer.  See generally United States v. Abodeely, supra.

When the Commissioner has the burden of proof, the Commissioner may either connect the deposits and expenditures to a likely source of income, or, where the taxpayer alleges a nontaxable source, negate each nontaxable source alleged by the taxpayer; the Commissioner need not do both.  United States v. Massei, 355 U.S. 595 (1958); see DiLeo v. Commissioner, 96 T.C. 858, 873 (1991), affd. 959 F.2d 16 (2d Cir. 1992).  Petitioner maintains that respondent has neither proven a likely source of income nor negated nontaxable sources.  Respondent, on the other hand, claims to have done both by a preponderance of the evidence.

A.  Likely Source of Income

Respondent asserts that a likely source of income for petitioner during 1989 and 1990 is money that petitioner wrongfully appropriated from his father's marijuana activity. (Respondent's agent acknowledged at trial that the adjustments to gross income determined in the notice of deficiency could not have been derived from petitioner's unsuccessful dog kennel business.)

As part of the stipulation of facts, petitioner objected to the admission of Exhibits P, S, T, U, AB, and AD offered by respondent, which purport to relate to the issue of a likely source of income.  We postponed ruling on petitioner's objections

during the trial in order to allow both parties an opportunity to present their arguments fully and to allow the Court to review carefully the exhibits in question. Petitioner no longer objects to the admission of Exhibits P (Judgment and Probation/Commitment Order regarding petitioner's father dated September 22, 1982) and U (Judgment and Probation/Commitment Order regarding petitioner's father dated April 29, 1988); those exhibits will therefore be received into evidence.

Exhibit S is an unsigned complaint dated October 26, 1987, by Special Agent Phil Wagner for the Minnesota State Bureau of Criminal Apprehension against Charles Lee Grass, an alias of petitioner's father, charging him with the manufacture and distribution of marijuana or possession with intent to manufacture and distribute marijuana. Exhibit S does not recite any facts which connect petitioner to the illegal activities of his father, nor does it reveal any facts which tend to show that petitioner's father possessed a substantial amount of money which petitioner could have appropriated. We therefore conclude that Exhibit S is irrelevant to the issue for which it is offered and is therefore inadmissible. Fed. R. Evid. 401.

Exhibit T is a copy of an indictment against John Robert Boone a/k/a Charles Lee Grass, filed on November 17, 1987, in which he was charged with the manufacture of, possession with intent to distribute, and distribution of, marijuana. As with Exhibit S, the indictment contains no mention of any cash, either

earned or possessed, by petitioner's father, nor does it connect petitioner to any of the activities of his father or show that petitioner appropriated money from him.  Accordingly, we hold that Exhibit T is irrelevant to the issue of a likely source of income for petitioner, and is inadmissible.

Exhibit AD is a memorandum prepared by Gwen Leftwitch, respondent's special agent, of a conversation she had with Dick Ripley, DEA special agent, dated June 6, 1995.  Neither were called to testify in support of the memorandum, which is therefore inadmissible as hearsay.  Fed. R. Evid. 801(c).

Exhibit AB consists of a compilation of computer printouts and photocopies of 6 newspaper articles pertaining to the criminal organization to which John R. Boone, Sr., belonged, referred to colloquially therein as the "Cornbread Mafia".  Respondent offered no witness to establish the truth of the matters stated in Exhibit AB, which we therefore hold to be inadmissible hearsay.  Fed. R. Evidence 801(c).

We turn now to address the substantive issue of whether respondent has proven a likely source of income for petitioner for 1989 and 1990.  Respondent argues that petitioner expended and deposited money having similar musty and mildewed characteristics to that spent by his father and that, as the marijuana business is a cash business, the cash more probably than not came from the same source.  Respondent's only basis for

asserting that petitioner's father spent musty and mildewed money is derived from the inadmissible Leftwitch memorandum.

Respondent avers that petitioner has provided the Court "with no explanation of the source of the cash expended and deposited other than his unbelievable cash-gift-cash-hoard story." However, we reiterate that the burden of proving a likely source of income in this matter lies on respondent. See supra pp. 20-21. We note in this connection that respondent did not call or depose petitioner's father, the individual who, along with petitioner, would most likely know of the existence of any cash hoard that may have been found or appropriated by petitioner.

Moreover, even if John R. Boone, Sr., had the cash hoard that respondent attributes to him, respondent has in no way connected petitioner to it. The fact that money spent by John R. Boone, Sr., and petitioner may have had similar musty and mildewed qualities, even if proven, standing alone would be insufficient to convince the Court that, more likely than not, the cash shared the same source.

For all of the above reasons, we hold that respondent has failed to prove a likely source for the amounts allegedly omitted from petitioner's returns in 1989 and 1990.

B. Nontaxable Sources

Respondent maintains, in the alternative, that there are no nontaxable sources for the amounts unreported on petitioner's

returns for 1989 and 1990 other than those agreed to by the parties in their stipulation. Respondent asserts that the sole unagreed nontaxable source, the alleged cash gift, has been negated. Petitioner argues that the unreported amounts deposited and expended in 1989 and 1990 were not includable in income because he was spending cash on hand at the beginning of 1989, cash that he claims was given to him by his great-grandfather in 1976.

In United States v. Massei, 355 U.S. at 595, the Supreme Court stated that "should all possible sources of nontaxable income be negatived, there is no necessity for proof of likely source." However, in Commissioner v. Thomas, 261 F.2d 643, 646 (1st Cir. 1958), revg. and remanding T.C. Memo. 1957-244, the Court of Appeals for the First Circuit noted that the

> burden of negating is not so broad as it sounds, for * * * the only source of nontaxable income which the taxpayers have contended accounts for taxpayers' increases in net worth, as we said, was a substantial cash gift * * *. It follows that * * * only that source needs to have been negated. [Emphasis added.]

See also United States v. Hiett, 581 F.2d at 1201; Kramer v. Commissioner, 389 F.2d 236, 238 (7th Cir. 1968), affg. T.C. Memo. 1966-234; Gatling v. Commissioner, 286 F.2d 139, 144 (4th Cir. 1961), affg. T.C. Memo. 1959-224; Parks v. Commissioner, 94 T.C. at 660; Boggs v. Commissioner, T.C. Memo. 1985-429.

We conclude that respondent may satisfy the burden of proof on this issue by negating petitioner's alleged nontaxable cash

hoard received by gift from his great-grandfather. By direct proof this would be almost impossible. But this Court has held that respondent may negate an alleged nontaxable cash hoard by proving that such a claim is "inconsistent, implausible, and not supported by objective evidence in the record." Parks v. Commissioner, supra at 661; see Boggs v. Commissioner, supra; Phillips v. Commissioner, T.C. Memo. 1984-133.

For the reasons which follow, we are convinced that respondent has shown that, more likely than not, petitioner's 1989 and 1990 bank deposits and cash expenditures were not derived from moneys obtained from his great-grandfather, the only unagreed nontaxable source asserted in this case.

1.  There is no evidence that Walker possessed a cash hoard, or that he would give it to petitioner if he did.

The objective evidence in the record does not support petitioner's contention that his great-grandfather possessed a large amount of cash on hand. In this regard, we note that Walker's adjusted gross estate was small (roughly $68,000) in comparison to the alleged cash hoard of approximately $115,000. Moreover, Walker had miscellaneous real and personal property, and does not appear to have been the type of individual who was likely to keep a cash hoard. See Shelhorse v. Commissioner, T.C. Memo. 1980-98. Walker also had mortgages on his property and other debts, which is inconsistent with a large cash hoard. See Thomas v. Commissioner, 223 F.2d 83, 88 (6th Cir. 1955). Also,

Walker's safe deposit box contained no cash at the time of his death.

Petitioner would have the Court conclude that, since Walker had no bank accounts and no cash in his safe deposit box at the time of his death, he must have possessed a sizable cash hoard. However, it is more likely that Walker was "dirt rich" and cash poor. In any event, we doubt that, if Walker had such a cash hoard, he would have kept it in a desk drawer, in a small building located apart from his house in town, while he kept no cash in his safe deposit box, where it would not be subject to theft or casualty. See Shelhorse v. Commissioner, supra.

Moreover, in his will, Walker left all of his property to Susanna and Jean, the natural objects of his bounty, making no provision for petitioner or any other of his descendants. No gift tax return was filed by or for Walker. Furthermore, there is no evidence that Walker ever told anyone about a cash hoard or a gift to petitioner. We do not think that the fact that petitioner was a tag-along companion who assisted his great-grandfather toward the end of his life would have imbued Walker with the desire to give his 11-year-old great grandson, three generations removed from him, almost twice as much as he bequeathed to his wife and daughter.

2. Petitioner's testimony is implausible, is not supported by objective evidence, and is inconsistent with prior statements he made to respondent's agent.

Petitioner testified that the unreported bank deposits and cash expenditures made during 1989 and 1990 stemmed from his great-grandfather's gift. Petitioner said that his great-grandfather gave him the money because Walker felt that he did not have much longer to live. Petitioner testified that Walker told him that he, petitioner, should use the money for "something purposeful" in his life, such as when he married or purchased a home. Petitioner claimed that Walker told him the money was located in a desk in Walker's office, in a small building situated approximately 100 yards from petitioner's home. Petitioner claimed that Walker told him never to tell anyone about the money.

Petitioner testified that the money was in a mostly red, cylindrical metal canister with a slip-off lid, and that the canister had some type of design on the outside of it about which he could not be specific. He said that the canister was about 8 inches tall and 10 inches in diameter. Petitioner testified that he found the canister lying in an unlocked drawer of a file cabinet attached to a metal desk. Petitioner claimed that he did not count the money because his great-grandfather told him not to do so.

Petitioner testified that he observed nothing in the canister other than currency of all denominations, which was not arranged in a specific manner. He claimed that he never changed the way the cash was situated in the canister after receiving it,

nor did he exchange the currency for higher denominations. Petitioner further stated that the cash smelled "old" to him when he opened the canister, "like old books or documents". Petitioner claimed that when he got the canister home, he put it on the top shelf of his bedroom closet underneath several other items, which he considered to be the "safest place" for the cash.

Petitioner said that he kept the canister in his closet throughout high school. After high school, he claimed to have kept the canister in his closet while he commuted to St. Catherine's. While at Eastern, he purportedly kept the cash in a closet in his dormitory, even on those occasions when he returned home. Petitioner claimed that it never bothered him to leave the money in the dormitory.

Petitioner said that he moved the canister from Maple Street to Columbia Court, and again to Howell Street, and that he left it in his bedroom at these residences every time he took a trip. Petitioner said that he did not put the cash in a bank because he "just decided to keep doing the same thing with it that * * * [his great-grandfather] had done with it." He testified that it did not bother him at the time that he was not earning interest on the money.

Petitioner testified that he did not keep any record of the amount of money he spent out of the canister, and that he never knew the total amount of money that it contained. In that

connection, petitioner stated that he was not sure whether he had enough money to purchase the Corvette (despite having already made a deposit on the car) until he went back home and counted out the necessary amount of cash.

Petitioner testified that he threw out the canister sometime after 1990 when the money was all gone. He claimed that he had kept the money in the canister from the day he got it, except for a small amount of cash which he had placed in his sock drawer in early 1989.

Petitioner claimed that he rarely spent money out of the canister prior to 1989. Once, he said, while in high school, he used some of the money to rent a car. In college, he purportedly bought a videocassette recorder with some of the cash. Occasionally, if he got behind in bills, he used a little bit of the money to "keep up". Petitioner kept no record of such expenditures, however.

We think that respondent has proven by a preponderance of the evidence that petitioner's testimony is implausible, self-serving, and contrived. We believe it unlikely that petitioner could keep a large sum of money in his bedroom closet for approximately 7 years without either his brothers' or parents' discovering it. Nor do we think that petitioner would keep such a large amount of money in a college dormitory or in his bedroom in the houses he shared. Such behavior is at odds, among other

things, with the fact that he took thousands of dollars of traveler's checks on trips to avoid losing cash.

Moreover, we think it implausible that petitioner would take out student loans if he had been given the money to use for "something purposeful".  We also do not think that petitioner would take out the loan for the Mustang at a relatively high annual percentage rate if he had a large cash hoard at the time he bought the car, only to pay the loan off with cash several months later.  Evidence of borrowing supports an inference that petitioner had no cash hoard, as a cash hoard obviates the need to borrow.  See Thomas v. Commissioner, 223 F.2d at 88.  Even if we believed that these actions could be explained as a consequence of petitioner's efforts to hide the money from his family in keeping with his great-grandfather's alleged wishes, petitioner never showed any large cash assets on documents that his family would never have reason to see, such as his mortgage application.

Also, we think it unlikely that petitioner would forgo earning interest on such a large sum of money.  See Conti v. Commissioner, T.C. Memo. 1992-616, affd. and remanded to correct a computational error 39 F.3d 658 (6th Cir. 1994); Cruz v. Commissioner, T.C. Memo. 1990-594; Phillips v. Commissioner, T.C. Memo. 1984-133.  Petitioner had a savings account from a very young age, and interest earned on the large amount of money would have provided him with a sizable sum relative to the amount of

gross income reported on his 1989 and 1990 returns.  Finally, we find it simply unfathomable that petitioner would <u>never</u> have counted the money in the canister in all the years he purportedly hoarded it, or that he would purchase the Corvette largely with cash without first ascertaining that the canister held a sufficient amount.  Cf. <u>Phillips v. Commissioner</u>, <u>supra</u>.

   a.  <u>Petitioner's testimony was inconsistent with his prior statements to respondent's agent.</u>

Petitioner's cash hoard testimony, when juxtaposed against the statements that petitioner made to Hensley, is totally inconsistent.  Although petitioner told Hensley that the drawer to the desk containing the money was locked, petitioner testified that it was unlocked.  Moreover, while initially claiming to be 15 when his great-grandfather gave him the money, petitioner testified that he was actually 11 years old, after being confronted by the fact that his great-grandfather had died several years before petitioner turned 15.  Furthermore, petitioner told Hensley that the cash was "crunched down inside the container", yet at trial petitioner claimed that the money was "just loosely laying" in the canister, and that some of the cash was wrapped in rubber bands "laying out flat".  Moreover, despite testifying that he never transferred the money out of the canister except to place a small portion in his sock drawer, petitioner told Hensley that he had placed the cash in a shoebox in 1987 or 1988.

Perhaps most revealing, despite telling Hensley during the second or third interview that he did not divulge the existence of the cash hoard to his wife until after the first interview in August 1992, petitioner testified that he initially told Sandra about the money in July 1989, and that he had forgotten about this earlier conversation. We find it unlikely that petitioner would fail to recall such a conversation with Sandra, if it had taken place, during his talks with Hensley. Petitioner and Hensley had discussed earlier the purchase of the Corvette with cash in a brown paper bag, a purchase that Sandra had witnessed apparently without surprise.

In sum, we conclude that respondent has proven that petitioner's testimony was irreconcilably and materially inconsistent with his prior statements to respondent's agent.

b.   <u>The testimony of Perri Warren and Scott Shaw does not convince the Court that petitioner had a significant amount of cash on hand prior to 1989.</u>

Ms. Warren, one of petitioner's best friends, claimed to have observed an unusual amount of currency in a canister in petitioner's bedroom at Howell Street in 1988 while in the process of straightening up his room in preparation for a visit of their landlord's mother. Based on petitioner's own testimony, we have some reservations as to whether Ms. Warren actually had access to petitioner's bedroom, in that petitioner testified that he put a deadbolt lock on his bedroom door and did not leave his

bedroom unlocked in order to deter another housemate who liked to snoop in others' belongings. Even discounting such reservations, Ms. Warren's testimony that the denominations of the bills were "twenties, fifties and one hundreds" and that the bills were "wrapped in little bitty bundles", is, in any event, flatly inconsistent with petitioner's claim that the money was just "loosely laying" in the can, and consisted of mainly tens and twenties.

Moreover, Ms. Warren could not testify as to what was below the first layer of cash that she purportedly saw. In addition, she did not remember the color of the alleged canister or its condition; she recalled only that it was metal. She also failed to perceive any odor emanating from the money despite the fact that much of the cash spent by petitioner in 1989 and 1990 smelled musty and mildewed.

Petitioner testified that Ms. Warren first revealed to him that she had observed money in his bedroom when petitioner questioned her in connection with her possibly testifying to that effect. Petitioner said that a mutual friend, Scott Shaw, had previously informed him that Ms. Warren had seen such money in petitioner's possession. However, upon direct examination by respondent, Mr. Shaw testified that he was never told by Ms. Warren that petitioner possessed a large sum of cash and that Ms. Warren never talked to him about seeing it. Mr. Shaw himself saw, at most, only a thousand dollars in petitioner's bedroom at

Howell Street, in fairly small denominations, scattered on petitioner's bed. Moreover, Mr. Shaw could not clearly recall if the money he observed on the bed was petitioner's or his own.

Finally, petitioner argues that where, as here, respondent attempts to prove a likely source of income and falls short, but successfully negates petitioner's alleged nontaxable source, respondent should nevertheless not prevail. Petitioner asserts that other cases holding that respondent need only negate nontaxable sources have in fact concluded that respondent also showed a likely source. However, this Court in Parks v. Commissioner, 94 T.C. at 661, held that, where respondent presented no evidence of a likely source, negativing nontaxable sources was sufficient, by itself, to prove an underpayment in a fraud case. (In a fraud case, respondent has the burden of proving by clear and convincing evidence that some part of an underpayment was due to fraud, DiLeo v. Commissioner, 96 T.C. at 873, a higher standard of proof than the preponderance of the evidence standard applicable in the case before us.)

Petitioner's attempt to distinguish Parks v. Commissioner, supra, on the ground that, in that case, no attempt was made to prove a likely source, is unavailing. We have already pointed out that the Commissioner need only connect bank deposits and expenditures to a likely source, or, where a taxpayer alleges a non-taxable source, negate that source; the Commissioner need not do both. United States v. Massei, 355 U.S. 595 (1958).

Based on the foregoing, we hold that respondent has proven a substantial omission of income within the meaning of section 6501(e)(1)(A) by negating the only unagreed nontaxable source alleged by petitioner. Petitioner does not dispute that unreported bank deposits and cash expenditures in the amounts of $30,763.94 and $84,948.89 for 1989 and 1990, respectively, if found to be improperly omitted from gross income, are subject to ordinary income taxes. Petitioner does not now claim any deduction or losses not allowed by respondent. Therefore, we hold that petitioner is liable for deficiencies in income tax for 1989 and 1990, the correct amount of which will be calculated under Rule 155.

## II. Respondent's Determination of Self-employment Tax

Respondent further determined that petitioner's omitted gross income was subject to self-employment taxes pursuant to section 1401 for 1989 and 1990. Section 1401 imposes a tax on self-employment income that is in addition to other applicable taxes. Section 1402(b) generally defines self-employment income as net earnings from self-employment derived by an individual. The term "net earnings from self-employment" means gross income derived by an individual from any trade or business carried on by such individual, less allowable deductions attributable to such trade or business, plus certain items not relevant here. Sec. 1402(a). The term trade or business for purposes of the self-employment tax generally has the same meaning it has for purposes

of section 162. Sec. 1402(c). Thus, to be engaged in a trade or business within the meaning of section 1402(a), an individual must be involved in an activity with continuity and regularity and his primary purpose for engaging in the activity must be for income and profit. See Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987).

Respondent asserts that petitioner misappropriated his father's marijuana cash hoard, and that such a conversion is income from a trade or business, because misappropriating the money occupied petitioner's "time, attention, and labor" and was for petitioner's own profit and livelihood. Petitioner, on the other hand, maintains that he earned no self-employment income in 1989 and 1990. His dog kennel business was unsuccessful, and reported a net loss for 1990.

Petitioner's testimony and that of his wife, and Ms. Warren satisfies us that petitioner did not carry on any trade or business activity in 1989 and 1990 other than his dog kennel business in 1990. Respondent's agent acknowledged that the dog kennel business could not have been the source for all of the additional funds asserted in the notice of deficiency.

As previously mentioned, respondent posits that money appropriated from petitioner's father is self-employment income to petitioner. However, we do not find that petitioner took part in his father's marijuana activity. We therefore hold that

petitioner is not liable for self-employment taxes pursuant to section 1401 on his unreported gross income for 1989 and 1990.

## III.  Is Petitioner Liable for the Section 6662(a) Accuracy-Related Penalties for Negligence for 1989 and 1990?

Respondent determined that petitioner is liable for the accuracy-related penalty under section 6662(a) for negligence for both 1989 and 1990.  Petitioner bears the burden of proof on this issue.  Rule 142(a); Neely v. Commissioner, 85 T.C. 934 (1985); Bixby v. Commissioner, 58 T.C. 757 (1972).

Section 6662(a) imposes an accuracy-related penalty of 20 percent on any portion of an underpayment of tax that is attributable to items set forth in section 6662(b).  Section 6662(b)(1) provides that section 6662(a) is to apply to any portion of an underpayment attributable to negligence or disregard of rules or regulations.  Section 6662(c) defines "negligence" to include any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code, and defines "disregard" to include any careless, reckless, or intentional disregard of rules or regulations.

The accuracy-related penalty of section 6662 does not apply to any portion of an underpayment if it is shown that there was reasonable cause for such portion and the taxpayer acted in good faith with respect thereto.  Sec. 6664(c)(1).  Other than his rejected claim of a nontaxable cash hoard, petitioner presented no evidence that he was not negligent in failing to report the

omitted gross income for 1989 and 1990, or that he had reasonable cause to do so.  Accordingly, respondent's determination that petitioner is liable for the accuracy-related penalty for negligence for those years must be sustained.  The correct amount of the section 6662(a) accuracy-related penalties for 1989 and 1990 will be calculated in a Rule 155 proceeding.

We have considered all other arguments advanced by the parties and found them to be either irrelevant or without merit.

IV.  Conclusion.

The record contains credible testimony that petitioner's reputation for truthfulness and veracity in the Springfield, Kentucky, community is good.  Nevertheless, based on our observations at trial and all of the evidence in the record, we are forced to conclude that there is a substantial lack of candor in petitioner's explanation as to how, when, and from what source he came into possession of the alleged large cash hoard that is the focus of this case.  It is not the Court's function to speculate as to the actual source of this money, and we decline the opportunity to do so.  We simply do not accept petitioner's version of the truth.

To reflect the foregoing and concessions,

An appropriate order will be issued, and decision

<u>will be entered under Rule</u>

<u>155</u>.